Lori Lowenthal Marcus*
Jerome Marcus*
Rachel Ghatan (CA SBN 204355)
THE DEBORAH PROJECT
P.O.B. 212
Merion Station, PA 19066
Telephone: (610) 880-0100
lorilowenthalmarcus@deborahproject.org
jmarcus@deborahproject.org
rghatan@deborahproject.org

JAVITCH LAW OFFICE
Mark L. Javitch (CA SBN 323729)
3 East 3rd Ave. Ste. 200
San Mateo, CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 648-0705
mark@javitchlawoffice.com

*local counsel for Plaintiff*

*Attorneys for Plaintiff*
KAREN FISS

*Admitted pro hac vice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN FISS, | Case No.: 4:24-cv-3415-HSG |
| Plaintiff, | |
| v. | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| CALIFORNIA COLLEGE OF THE ARTS, | |
| Defendant. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................... i

THE FACTS AT ISSUE IN THIS CASE............................................................................... 1

ARGUMENT ......................................................................................................................... 3

    I.      PLAINTIFF HAS ADEQUATELY ALLEGED DISCRIMINATORY TREATMENT IN VIOLATION OF TITLE VII ...................................................... 3

    II.     PLAINTIFF HAS ADEQUATELY ALLEGED INJURY FROM A HOSTILE WORK ENVIRONMENT ....................................................................... 5

    III.    PLAINTIFF HAS ADEQUATELY ALLEGED THAT THE DISCRIMINATION AGAINST HER WAS BASED ON HER RELIGION, NATIONAL ANCESTRY AND ETHNIC IDENTITY...................................................................................... 9

    IV.    PLAINTIFF HAS ADEQUATELY ALLEGED THAT CCA RECEIVED FEDERAL FUNDING THAT SUBJECTS THE INSTITUTION, AND ITS TREATMENT OF THE PLAINTIFF, TO TITLE VI .............................................11

    V.     PLAINTIFF STATES A CLAIM UNDER CALIFORNIA EDUCATION CODE SECTION 66252, BECAUSE THE STATUTE'S EXPLICIT LANGUAGE PROTECTS ALL "INDIVIDUALS," NOT JUST STUDENTS ......................... 13

    VI.    PLAINTIFF PROPERLY STATES A CLAIM UNDER CALIFORNIA GOVERNMENT CODE SECTION 12920.......................................................... 14

    VII.   PLAINTIFF STATES A CLAIM FOR BREACH OF CONTRACT.................... 15

    VIII.  CONCLUSION.................................................................................................. 15

1

## TABLE OF AUTHORITIES

2

3

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................10

4

*Brooks v. City of San Mateo*,
  229 F.3d 917  (2000).................................................................................................15

5

6

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682, 724 (2014).........................................................................................11

7

*Castleberry v. STI Grp*,
  863 F.3d 259, 264 (3d Cir. 2017).............................................................................7

8

9

*Church of Lukumi v. City of Hialeah*,
  508 U.S. 520 (1993).................................................................................................11

10

*Church of Lukumi v. Hialeah*,
  723 F.Supp. 1467 (S.D. Fla. 1989) .........................................................................11

11

12

*Fluidigm Corp. v. bioMérieux SA*,
  No. 19-cv-02716-LHK (N.D. Cal. Dec. 5, 2019) ...................................................12

13

14

*Gholson v. Beacon Health Options, Inc.*,
  SACV-22-00445-CJC (DFMx) (C.D. Cal. Apr. 20, 2023).......................................4

15

16

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993)..................................................................................................6-7

17

18

*Hashimoto v. Dalton*,
  118 F.3d 671 (9th Cir. 1997) ....................................................................................4

19

20

*Hayut v. State Univ of New York*,
  118 F.3d 671 (2d Cir. 2003)......................................................................................6

21

*Laub v. U.S. Dep't of the Interior*,
  342 F.3d 1080 (2d Cir. 2003)..................................................................................12

22

23

*Nazir v. United Airlines, Inc.*,
  178 Cal.App.4th 243 (2009) .....................................................................................6

24

25

*O'Shea v. Yellow Tech. Servs., Inc.*,
  185 F.3d 1093 (10th Cir. 1999) ................................................................................6

26

27

*O'Day v. McDonnell Douglas Helicopter Co.*,
  79 F.3d 756 (9th Cir. 1996) ......................................................................................4

28

1

2

*Reid v. Google, Inc.*,
   50 Cal.4th 512  (2010) ...................................................................................................14

3

*Reeves v. C.H. Robinson Worldwide, Inc.*,
   594 F.3d 798 (2010) .........................................................................................................8

4

5

*Reynaga v. Roseburg Forest Prods.*,
   847 F.3d 678 (9th Cir. 2017) ...........................................................................................7

6

7

*Ruggles v. California Polytechnic State Univ.*,
   797 F.2d 782 (9th Cir. 1986) ...........................................................................................4

8

*Sharp v. Activewear, L.L.C.*,
   69 F.4th 974 (9th Cir. 2023) ............................................................................................4

9

*Steiner v. Showboat Operating Co.*,
   25 F.3d 1459, 1463 (9th Cir. 1994) .................................................................................7

10

11

*Van v. Black Angus Steakhouses, LLC*,
   2018 U.S. Dist. LEXIS 198102 (N.D. Cal. Nov. 20, 2018) .............................................4

12

13

*Yartzoff v. Thomas*,
   809 F.2d 1371 (9th Cir. 1987) .........................................................................................4

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Karen Fiss files this Memorandum in opposition to the Motion of Defendant California College of the Arts ("CCA") to Dismiss this case.  The motion should be denied because it both misstates the governing law and simply ignores many paragraphs of the Complaint which clearly allege the facts which CCA tells this Court are missing from Plaintiff's pleading.

## THE FACTS AT ISSUE IN THIS CASE

Plaintiff Karen Fiss is an art historian, with her doctorate from Yale University and an extensive list of publications and professional accomplishments.  Amended Complaint ("AC") ¶¶26-29.  She is tenured member of the faculty at CCA.  AC ¶26.  Professor Fiss is a Jew, and the Amended Complaint alleges, as fact, that her religious beliefs include a commitment, which Professor Fiss shares with a great many other Jews around the world, to the existence of Israel as a Jewish state.  ¶30.  The Amended Complaint further alleges, as a fact, that this commitment forms the basis for Professor Fiss's ethnic identity as a Jew and is an inherited part of her national ancestry.  ¶¶19, 31.  The Amended Complaint alleges that this commitment is recognized by the United States Department of Education, Office of Civil Rights, as elements of Jewish ethnic identity and national ancestry.  ¶¶21-24, 127-130.

The Amended Complaint now before this Court describes in detail both an environment completely, and intentionally, hostile to Plaintiff's religious commitments, national ancestry and ethnic identity, and discrete adverse employment actions taken by the CCA administration to punish the Plaintiff because she has given voice to that commitment.

The environment at CCA described by the Amended Complaint and at issue in this case is defined by categorical refusal to allow even public expression of Plaintiff's beliefs.  *See*, *e.g.,* ¶¶33, 35, 44-45, 49, 52. Instead, CCA's official orthodoxy is reflected in a public statement, joined in by numerous CCA departments, applauding the rape and murder of 1200 Israelis on October 7, 2023. Issued a few days after those atrocities were committed, this public statement announced that

"Decolonization is not a dinner party," and explained that the abominable acts committed on that day were necessary to end the existence of the Jewish State of Israel.  ¶60-62.

Plaintiff filed a complaint within CCA shortly after this public statement was released and adopted by the CCA departments and faculty.  ¶65.  CCA delayed responding for weeks, but ultimately rejected Plaintiff's complaint.  ¶66.  Subsequently, a prominent donor to CCA demanded that the statement be taken down, and because of this demand, it was.  ¶¶67-68.  But even after that occurred, CCA concluded that the statement was an entirely innocent exercise of academic freedom.  ¶69.

The Dinner Party statement was just one of numerous statements, posters, and events at CCA attacking Plaintiff's beliefs.  Plaintiff's commitment to Israel was attacked at a faculty meeting with obscene language that would never be tolerated if it were used in speaking about any other group, religious belief or nationality.  Indeed, the environment at CCA is so toxic, and so relentlessly hostile to Jewish beliefs, commitments and Jewish identity, that numerous other people have also been injured by it.  The dictionary defines an "environment" as "the circumstances, objects, or conditions by which one is surrounded: the factors and influences that affect the growth, health, progress, functioning, etc., of someone or something." https://www.merriam-webster.com/dictionary/environment.  The facts describing the environment at CCA show that no matter where one turns, hostility to Plaintiff's beliefs and identity is everywhere.  She, and those who share her identity and commitments are indeed "surround[ed]" by such enmity.

The adverse employment actions include finding Plaintiff guilty of harassing a student because Professor Fiss spoke to the student—who is from Kuwait—and informed the student of facts about Kuwait, and its treatment of Palestinians, which the student frankly said she did not want to hear.  *See generally*, ¶¶78-106.  The student had demanded that Fiss write to her congressman to demand an immediate cease-fire in Gaza—that is, to demand that Israel cease immediately to defend itself from Hamas, which committed the atrocities of October 7.  ¶80.  It was in response to this demand that

Professor Fiss entered into the conversation with the student that resulted in the discussion about Kuwait, which ended when the student said she had no interest in learning anything she didn't already know about the region: "I like [my] echo chamber." AC ¶88.

The student responded to this conversation by filing a complaint against Professor Fiss, claiming harassment. In contrast to CCA's announcement that academic freedom protected those who publicly call for the murder of Jews in Israel, CCA determined that Plaintiff's conversation with this student – in which Fiss did not raise her voice or use foul language or demand anything of the student in any way— was a violation of the student's rights. Fiss was reprimanded. Her personnel file was altered to include the warning that if she repeated this conduct, she could be further disciplined or fired. She was required to submit to "training" on harassment and discrimination.

The Amended Complaint alleges in detail the impact on the Plaintiff of this hostile environment in which she works and of the punitive discipline imposed upon her because she expressed views of which CCA does not approve. Both the hostility of the environment and adverse employment action, the Amended Complaint shows in detail, have adversely affected the terms of Plaintiff's employment and have effectively driven her almost completely off the CCA campus. She comes when she has to now, and leaves as soon as she can, because she knows that while she is there she is on enemy territory. *See*, *e.g.,* ¶¶43, 52, 53, 134.

## ARGUMENT

## I. PLAINTIFF HAS ADEQUATELY ALLEGED DISCRIMINATORY TREATMENT IN VIOLATION OF TITLE VII

CCA's attack on Plaintiff's Title VII claim completely ignores the Amended Complaint's allegations that the Plaintiff was sanctioned, punished and threatened – and that she remains threatened – with dismissal because she spoke to a Kuwaiti student and told the student things the young woman did not know about her country and the Middle East. These punishments included required reeducation and

1    the threat that if the Professor Fiss engages in the same conduct "again, you will remain subject to

2    further disciplinary action that could result in discharge for cause."

3        Among those employment decisions that can constitute an adverse employment action are

4    termination, dissemination of a negative employment reference, issuance of an undeserved negative

5    performance review and refusal to consider for promotion.  *See O'Day v. McDonnell Douglas

6    Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) (termination); *Hashimoto v. Dalton*, 118 F.3d 671, 676

7    (9th Cir. 1997) (negative reference); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (negative

8    performance reviews); *Ruggles v. California Polytechnic State Univ.*, 797 F.2d 782, 786 (9th Cir. 1986)

9

10   (refusing to consider for promotion).

11       Thus, the law is clear that the discipline imposed on Plaintiff is sufficient injury to form the basis

12   of a Title VII claim:

13
       > in addition to the obvious impact having such a warning in Plaintiff's file might have on
14     > her future promotion prospects, the warning was a form of progressive discipline that had
       > a material adverse effect on the terms and [*19] conditions of Plaintiff's employment. *See
15     > Van v. Black Angus Steakhouses, LLC*, 2018 U.S. Dist. LEXIS 198102, 2018 WL 6069815,
       > at *7 (N.D. Cal. Nov. 20, 2018) (finding that there was a genuine dispute of fact regarding
16     > whether "formal warnings to Plaintiff that discipline or termination could result if she did
       > not improve her performance"—which "could be construed as forms of progressive
17     > discipline"—constituted adverse employment action); Fonseca, 374 F.3d at 847 (reversing
       > summary judgment for defendant in discrimination case on the basis that the "warning
18     > letter . . . constitute[d] an adverse employment action").

19     *Gholson v. Beacon Health Options, Inc.*, U.S. Dist. LEXIS 69564 (C.D. Cal. Apr. 20, 2023)

20       Ignoring the relevant allegations of the Amended Complaint, CCA asserts that Plaintiff has failed

21   to claim that similarly situated employees who are not Jews were treated more favorably.  The But

22
     Plaintiff's claim alleges exactly that, both in those precise words and with numerous specific examples.
23
     Defendant's brief simply ignores numerous the allegations, starting with the clear statement in ¶151 that
24
     "Defendant treated Plaintiff differently from, and worse than, the way it treated others who do not share
25
     Plaintiff's ancestral, ethnic and religious commitments."
26

27

28

The AC explains in detail that this disparity in treatment consisted of disciplining Plaintiff for speaking to a Middle Eastern student about her country and telling her things she did not know (and did not want to hear), ¶149a, while at the same time numerous professors used compulsory class time to convey to students their own opinions about the war between Israel and her neighbors in which Israel's conduct, and existence, were denounced as crimes against humanity. All of the latter conduct was protected by CCA as the exercise of academic freedom. Thus, as the Amended Complaint alleges, viewpoints aligned with the CCA-approved antisemitic orthodoxy—even full-throated glorification of the horrific murders of Jews—are shielded under the pretext of academic freedom, [while] dissenting perspectives are met with censorship and punishment. ¶46. Similarly, the obscene denunciation of Plaintiff's beliefs at official CCA faculty meetings was not disciplined.

Many of the persons espousing the CCA approved view, who were treated more favorably than Plaintiff, are identified by name in ¶61, along with a discussion of the more favorable treatment they were accorded. This makes clear that CCA is simply wrong in arguing, Br. at 7, that "Plaintiff [improperly] fails to plead that there are any similarly situated non-Jewish employees who were treated more favorably than Plaintiff." Plaintiff has alleged exactly that, has named many people accorded the more favorable treatment, and has described the more favorable treatment in extensive detail.

## II.    PLAINTIFF HAS ADEQUATELY ALLEGED INJURY FROM A HOSTILE WORK ENVIRONMENT

CCA's attack on Plaintiff's hostile work environment claim fails for essentially the same reason: CCA simply ignores the paragraphs of the Complaint that plead the things CCA tells this Court plaintiff has not pled. Thus, CCA is wrong in arguing that:

> Plaintiff has failed to plead that she was subjected to verbal conduct of a religious or ethnic nature in any of these circumstances. The Instagram post does not address Judaism or Zionism. Although it addresses Israel, Plaintiff does not plead that all Jews are Israeli or that she is Israeli. It therefore cannot be concluded from the pleadings that the Instagram post addressed Plaintiff's religion, ancestry, or national origin.

1    In advancing this argument Defendant ignores the Amended Complaint's allegations about the

2    behavior of academics who issued public statements praising Hamas's murder of 1200 Jews in Israel on

3    October 7, AC ¶¶60-62, as well the Plaintiff's allegations that numerous art professors used class time to

4    advance to students their own political opinions denouncing Israel and the entire idea of a Jewish state.

5    AC ¶¶15, 32, 50.  The AC alleges that this behavior was not only not punished – all such acts were

6    officially declared to be protected exercises of academic freedom.  AC ¶¶66, 111.

7        There is no quantitative formula to determine whether conduct was severe and pervasive.

8    Instead, a plaintiff must show that discrimination in her workplace was "sufficiently severe and

9    pervasive to alter the conditions of the victim's employment and create an abusive working

10   environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

11   Severity and pervasiveness are "alternative possibilities: some harassment may be severe enough to

12   contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate

13   the workplace only if it is pervasive." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). Often,

14   "the severity and pervasiveness evaluation is particularly unsuited [even] for summary judgement [sic]

15   because it is 'quintessentially a question of fact.'" *Id.* at 429 (quoting *O'Shea v. Yellow Tech. Servs.,*

16   *Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)) (*see also Hayut v. State Univ. of New York*, 352 F.3d 733,

17   745 (2d Cir. 2003) ("Generally speaking, this analysis is fact-specific and, therefore, as in this case, is

18   best left for trial.")

19       Ignoring the force of such allegations, CCA attempts unsuccessfully to escape the force of

20   Plaintiff's many detailed claims regarding the hostility of the CCA campus to Plaintiff's religious

21   beliefs, national ancestry and ethnic identity, on the ground that the hostility was not limited to Plaintiff

22   herself but was directed as well to others, including other faculty, students and even members of the

23   public. But this argument fails for two reasons.

1      First, the Amended Complaint does indeed allege numerous actions that were directed

2 specifically at the Plaintiff; these actions alone are more than sufficient to create a hostile environment,

3 and these actions directly injured the Plaintiff.  These actions include, most importantly, the imposition

4 of discipline, and the continuing threat of termination, in response to Plaintiff's speaking to students to

5 convey a message with which the student disagreed.

6      In addition, Plaintiff was affected directly by the "Decolonization is not a dinner party" post and

7 the College's full-throated endorsement of that post and its murderous message.[1]

8

9      The remaining incidents also contributed to, and illustrate, the hostile environment that surrounds

10 the Plaintiff.  All of these events occurred within the last academic year, giving the lie to CCA's claim

11 that they are not "temporally proximate," Br. at 9.  All manifest precisely the same hostility to the

12 commitment to Israel that has been directed at Plaintiff.

13      The Ninth Circuit has quite recently rejected the approach taken by CCA in its attack on

14 Plaintiff's complaint:

15

16      Notably, individual targeting is not required to establish a Title VII violation. *See Reynaga*

17     *v. Roseburg Forest Prods.*, 847 F.3d 678, 687 (9th Cir. 2017). "It is enough," we have held,
     "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to

18     do her job, to take pride in her work, and to desire to stay on in her position." *Steiner v.*
     *Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994). "When the workplace is

19     permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe
     or pervasive to alter the conditions of the victim's employment and create an abusive

20     working environment, Title VII is violated." *Harris*, 510 U.S at 21 (internal quotation
     marks and citations omitted). [**8]

21

22

23
_____

24

25 [1] CCA seeks to diminish the importance of Plaintiff's injury from this post by asserting that it was
 ultimately taken down.  This ignores the Amended Complaint's clear allegations that the post remained

26 up for months; that it was only taken down because it irritated a wealthy donor, and long after Plaintiff's
 own complaint about it had been explicitly rejected; and that, even after the donor's objection had been

27 received, CCA convinced itself that the post's call for the murder of Jewish Israelis was a protected
 exercise of academic freedom.  AC ¶69.

28

*Sharp v. Activewear, L.L.C.* 69 F.4th 974, 978 (9th Cir. 2023).  Moreover, "[w]orkplace conduct is to be viewed cumulatively and contextually, rather than in isolation. *Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010)* (en banc).  *Ibid.*  CCA's effort to disaggregate the Complaint's allegations, separating them from one another as well as from the Plaintiff, thus fails.

As *Sharp* makes clear, defendant's argument fails because it ignores the fact that Plaintiff's injury comes from the hostility of the environment.  Plaintiff has pled in elaborate detail how that hostility affected her, and how it has prevented her from doing her job and even impeded her ability to be on campus.  AC ¶¶53, 116-124.

The allegations regarding CCA's treatment of others who have also been victimized by the same hostility are present to demonstrate the severity and pervasiveness of that hostility.  While CCA admits that such allegations are necessary, Defendant ignores the fact that all of these matters are actually alleged.[2]  Plaintiff's claim is that she was injured by the environment, and that environment was created by, and its existence is proven by, the sum of all of these events.

The hostile environment at issue in this case was created by all of the acts and statements at issue.  If, for example, at a faculty meeting, an obscene attack on Plaintiff's beliefs was permitted with no punishment, that fact empowers the people who support such attacks and makes clear that CCA approves of such attacks and so will do nothing to stop them or to protect anyone who holds the beliefs that Plaintiff holds, and that are the object of such attacks.

---

[2] CCA also attempts to have its cake and eat it, complaining in the same paragraph that Plaintiff's claims about the hostility of the CCA environment are inadequate because she hasn't pled pervasiveness – that is, that Plaintiff has failed to allege that the hostility manifested itself over an extended period—while at the same time also complaining that the allegations fail because not all events occurred at the same time, so they were not "temporally proximate."

1

2

3

4

These are the things that allow a hostile environment to come into existence and to remain in existence.  Plaintiff's cognizable injury is caused directly by the hostile environment, not directly by each of the actions that helped to create that environment.

## III. PLAINTIFF HAS ADEQUATELY ALLEGED THAT THE DISCRIMINATION AGAINST HER WAS BASED ON HER RELIGION, NATIONAL ANCESTRY AND ETHNIC IDENTITY

CCA also completely ignores the AC's allegations when it claims that "CCA's investigation of the students' complaints and consequent finding of policy violations was not 'verbal conduct of a religious or ethnic nature'" because Plaintiff failed to allege "that CCA representatives used religious or ethnic terms when undertaking the investigation or in issuing its findings to Plaintiff."

In addition, CCA's argument rests on its refusal to acknowledge the AC's detailed, well-supported allegations that Plaintiff's commitment to Israel is her religious belief, a commitment of her national ancestry and an element of her ethnic identity.  *See* AC ¶¶19, 31.  It also rests on CCA's refusal to acknowledge the fact, alleged in the Amended Complaint, that the commitment to Israel has been recognized by the United States Department of Education, Office of Civil Rights, as an element of Jews' national ancestry and ethnic identity.  The AC says this clearly:

20. As a result, the United States Department of Education, Office of Civil Rights, has recognized that discrimination against Zionism and Zionists is a form of antisemitism, because it constitutes discrimination against Jews on the basis of their ethnic identity, national origin and national ancestry.

21. The United States Department of Education, Office of Civil Rights, has issued at least two determinations that discrimination against individuals on the basis of their commitment to Zionism constitutes discrimination on the basis of shared ancestry, and is therefore a violation of Title VI.

22. Thus, a letter ruling from the U.S. Department of Education, Office For Civil Rights, issued April 3,2023, to the University of Vermont and State Agricultural College, determined that anti-Zionist conduct constitutes a violation of the rights of Jewish students under Title VI because it constitutes discrimination on the basis of shared ancestry and, therefore, national origin discrimination. A true and correct copy of the letter ruling is attached hereto as Exhibit A.

23. That letter identified as "antisemitic" a series of tweets by a University of Vermont faculty member. None of the tweets contained the word "Jew" or Jewish." Instead, their antisemitic content consisted of repeated denunciations of Zionism and Zionists, such as "its [sic] good and funny" "for me, a TA, to not give Zionists credit for participation;" "why do so many Zionists work for the writing center[?];" "I get the indelible [sic] surge [sic] to cyber bully" when receiving "posts from UVM Zionist Instagram accounts;" and "serotonin rush of bullying Zionists on the public domain."

24. Similarly, on December 13, 2022, the U.S. Department of Education, Office for Civil Rights issued a Notice advising that impermissible discrimination against Jews "on the basis of national origin (shared ancestry)" would be proven by facts demonstrating that "University-recognized student organizations passed a bylaw against inviting speakers who support 'Zionism, the state of Israel, and the occupation of Palestine." *See* Exhibit B.

Plaintiff also alleged clearly that discrimination against her was on the basis of her commitment to Israel, and that—just as stated by the Department of Education Office of Civil Rights, plaintiff's own particular commitment to Israel is an element of her particular religious belief, national ancestry and ethnic identity. *See* AC ¶¶20-24.

CCA offers no argument against any of these allegations. It simply pretends they aren't there, and that pretense forms the basis for CCA's claim that Plaintiff has not alleged a religious, national or ethnic component to the discrimination against her.

CCA's argument fails for the additional reason that Plaintiff's allegations regarding the content of her religious beliefs control—both as a matter of the law governing Motions to Dismiss and more broadly. The 12(b)(6) point is elementary: on a motion to dismiss like the one before this Court now, the Complaint's allegations are taken as true so long as they're plausible. Plaintiff's Amended Complaint set out the centrality of Israel within Plaintiff's religious beliefs, her ancestral commitments, and her ethnic identity in careful detail, with reference to extensive supporting material. *See* AC ¶¶19, 31. Under *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), these allegations must be assumed to be true for purposes of the instant motion.

More broadly, however, Plaintiff's allegations regarding the content of her sincerely held religious beliefs cannot be second-guessed by any court. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014); *Church of Lukumi v. City of Hialeah*, 508 U.S. 520 (1993).

To be clear, Plaintiff is not arguing that the Court, or any party, must accept plaintiff's beliefs as in fact true. But it does mean that her religious beliefs must be respected in the sense that she cannot be harassed or discriminated against for having such beliefs or for expressing them.

To establish the sincerity of her beliefs Plaintiff's Amended Complaint provides the sources of, and evidence for, those beliefs in Jewish texts and Jewish culture. AC ¶19, 31. This is the proper path. The trial court opinion in *Lukumi,* for example, reflects an extensive factual record, including oral testimony, describing both the history and substance of the religious beliefs and practices there at issue. *See Church of Lukumi v. Hialeah*, 723 F.Supp. 1467, 1469-1474 (S.D. Fla. 1989) aff'd 936 F.2d 586 (11th Cir. 1991), rev'd 508 U.S. 520 (1993). The FAC sets forth the basis for Plaintiff's presentation of this factual showing,[3] CCA ignores it all.

## IV. PLAINTIFF HAS ADEQUATELY ALLEGED THAT CCA RECEIVED FEDERAL FUNDING THAT SUBJECTS THE INSTITUTION, AND ITS TREATMENT OF THE PLAINTIFF, TO TITLE VI

Plaintiff has also adequately alleged that CCA receives funding that places it, and the actions here at issue, under the scope of Title VI. CCA attempts to shield itself behind the rule that a Title VI employment discrimination claim must allege that federal assistance supported the program at issue—a proposition with which Plaintiff does not quarrel. But CCA ignores the obvious fact that there is no individual CCA program at issue in this case. CCA itself identifies no specific program which it claims

---

[3] The purpose of this section is thus to explain what the sources are of Plaintiff's beliefs, commitment and identity. The cited paragraph provides the basis for Plaintiff's showing that these are in fact her sincerely held beliefs – not, it should be clear, because Plaintiff is asking this Court to determine that Plaintiff's beliefs are true.

must be the object of federal funding in order for Plaintiff's claims to be valid. The reality, clearly expressed in the Amended Complaint, is that resources from throughout the institution have been expended to create the hostile environment here at issue and to take the specific actions, such as the discriminatory discipline imposed on Plaintiff, which are at issue here.

Thus, the Amended Complaint alleges that numerous departments supported the post in support of the murder of Jewish Israelis, and that teachers in numerous departments used class time to denounce the Plaintiff's beliefs, commitments, and identity.  And what specific program, other than the administration of CCA itself, is the object of the resources expended to discipline the Plaintiff for speaking to a Middle Eastern student and telling the student things she did not want to hear?  CCA does not say.[4]

Because the entire institution's resources have been expended in creating the environment, and in imposing the adverse employment actions, here at issue, Title VI applies so long as the institution itself receives federal funds—a fact clearly alleged in the Amended Complaint and which CCA does not dispute.  Accordingly, the Title VI claim stands.

---

[4] If such fine distinctions are to be made among the sources of funding for specific offices or personnel within CCA, then Plaintiff respectfully requests the opportunity to take discovery to gather this information, which is not publicly available.  *Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) ("[D]iscovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." (quotation marks omitted)).  *See also Fluidigm Corp. v. bioMérieux SA,* No. 19-cv-02716-LHK, 2019 U.S. Dist. LEXIS 210944 (N.D. Cal. Dec. 5, 2019).

1
2

**V.    PLAINTIFF STATES A CLAIM UNDER CALIFORNIA EDUCATION CODE SECTION 66252, BECAUSE THE STATUTE'S EXPLICIT LANGUAGE PROTECTS ALL "INDIVIDUALS," NOT JUST STUDENTS**

3

Ignoring the relevant provision of the California statute forming the basis for Count III of the

4

Complaint, CCA asks this Court to dismiss Plaintiff's claim under California Education Code §66270 on

5

the asserted ground that an earlier section of that law protects only students.  But CCA has read only the

6

first line of the statute it cites, and none of the statute is invoked as the basis for Count III.

7
8

Subsection (a) of Section 66252 does indeed speak of the right of "students" to participate in

9

education without discrimination.  But subsection (c) of that provision, and all of Section 66270, are not

10

so limited.  Subsection (c) of Section 66252 provides that:

11
12
13

> Harassment on school grounds *directed at an individual* on the basis of personal characteristics or status creates a hostile environment and jeopardizes equal educational opportunity as guaranteed by the California Constitution and the United States Constitution.

14

*Id.* (emphasis added).  And all of Section 66270 provides that "no person" shall be discriminated

15

against on the basis of forbidden characteristics, including religion, ethnicity and national origin.  Thus,

16

the relevant command to avoid harassment is explicitly *not* limited to students, but extends to all

17

individuals.

18
19

Eliminating an institution's discrimination against teachers on the basis any forbidden

20

characteristic is an essential element in ensuring that the education provided by that institution will

21

properly educate students.  This case is a vivid example of that fact: Plaintiff was punished for speaking

22

to a student and conveying information that the student did not know—and that CCA apparently wanted

23

to keep the student from learning.  That is exactly what a rule barring discrimination in education is

24

supposed to prevent.

25
26
27
28

1

**VI.    PLAINTIFF PROPERLY STATES A CLAIM UNDER CALIFORNIA GOVERNMENT**
**CODE SECTION 12920**

2

Plaintiff's claim under California Government Code Section 12920 may proceed because

3

Plaintiff has indeed exhausted her administrative remedies.  Plaintiff's Right to Sue letter, obtained from

4

the California Civil Rights Department, is attached hereto as Exhibit A to the declaration of Jerome M.

5

Marcus.

6

7

On the merits, Plaintiff's claim is clearly sufficient. Indeed, the statute itself sets forth the

8

following substantive rules that manifestly support Plaintiff's claim:

9

(b) A single incident of harassing conduct is sufficient to create a triable issue regarding
the existence of a hostile work environment if the harassing conduct has unreasonably

10

interfered with the plaintiff's work performance or created an intimidating, hostile, or

11

offensive working environment. In that regard, the Legislature hereby declares its rejection
of the United States Court of Appeals for the 9th Circuit's opinion in *Brooks v. City of San*

12

*Mateo*, 229 F.3d 917 (2000) and states that the opinion shall not be used in determining
what kind of conduct is sufficiently severe or pervasive to constitute a violation of the

13

California Fair Employment and Housing Act.

14

(c) The existence of a hostile work environment depends upon the totality of the
circumstances and a discriminatory remark, even if not made directly in the context of an

15

employment decision or uttered by a nondecision maker, may be relevant, circumstantial

16

evidence of discrimination. In that regard, the Legislature affirms the decision in *Reid v.*
*Google, Inc*., 50 Cal.4th 512 (2010) in its rejection of the "stray remarks doctrine."

17

[]

18

(e) Harassment cases are rarely appropriate for disposition on summary judgment. In that
regard, the Legislature affirms the decision in *Nazir v. United Airlines, Inc*., 178

19

Cal.App.4th 243 (2009) and its observation that hostile working environment cases involve

20

issues "not determinable on paper."

In these statutory directives, the California legislature has set forth standards that mandate denial

21

22

of CCA's motion to dismiss Plaintiff's claim under Section 12920.  Plaintiff has clearly alleged more

23

than a single incident of harassing conduct, yet even one such instance is enough.  Moreover, the

24

legislature has directed that harassment cases should not normally be terminated even on summary

25

judgment, which comes after Plaintiff has had the opportunity to take discovery.  Here, *a fortiori*, the

26

case is at its threshold, on a Motion to Dismiss.

27

28

## VII.    PLAINTIFF STATES A CLAIM FOR BREACH OF CONTRACT

Plaintiff's claim for breach of contract is based on CCA's own internal policy on non-discrimination.  As CCA does not dispute, this a private agreement, not a law.  It is therefore irrelevant that a promise to comply with the law does not constitute consideration for a contract.  Plaintiff is not seeking to enforce a promise to comply with the law; she is enforcing CCA's own promise to comply with its own policy.  Whether that policy sets a standard of conduct that is the same as, or more generous than, the one imposed by the law—something that CCA does not discuss in its brief—is irrelevant.  The CCA policy is the basis for the contract.

Regardless of whether Plaintiff has properly pled dollar damages, she has clearly pled a valid claim for injunctive relief, including, among other things, removal from her file of the threat to fire her if she ever again tells a student information about the Middle East that the student does not want to hear.  CCA does not deny that the request for such injunctive relief is properly pled as a remedy for breach of contract.

## VIII.    CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court deny Defendant's Motion to Dismiss.

Dated: November 5, 2024          Respectfully submitted,

By:    /s/ Mark L. Javitch
Mark L. Javitch (CA 323729)
Javitch Law Office
3 East 3rd Ave. Ste. 200
San Mateo, CA 94401
Tel: (650) 781-8000
Fax: (650) 648-0705
mark@javitchlawoffice.com

Lori Lowenthal Marcus* (PA 53388)
Jerome Marcus* (PA 50708)
Rachel Ghatan (CA 204355)
The Deborah Project
P.O.B. 212
Merion Station, PA 19066
Tel: 610.880.0100

lorilowenthalmarcus@deborahproject.org
jmarcus@deborahproject.org
rghatan@deborahproject.org

*Admitted Pro Hac Vice

*Attorneys for Plaintiff*
KAREN FISS

## <u>CERTIFICATE OF SERVICE</u>

Filed electronically on November 5, 2024, with the United States District Court for the Northern District of California CM/ECF system.

Notification was therefore automatically sent through the CM/ECF system to:

    United States District Court
    Northern District of California

And all counsel of record as recorded on the electronic service list.


Respectfully submitted,


By: /s/ Mark L. Javitch
        Mark L. Javitch