UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN FISS,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CALIFORNIA COLLEGE OF THE ARTS,<br><br>　　　　　Defendant. | Case No. 24-cv-03415-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND DENYING MOTION TO STRIKE**<br><br>Re: Dkt. Nos. 35, 45 |

Pending before the Court are a motion to dismiss and motion to strike filed by Defendant California College of the Arts ("CCA"). Dkt. Nos. 34, 35. The Court finds these matters appropriate for disposition without oral argument and the matters are deemed submitted. *See* Civil L.R. 7-1(b). For the reasons detailed below, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss and **DENIES** the motion to strike.

## I.  BACKGROUND[1]

Plaintiff Karen Fiss is a tenured professor at CCA. *See* Dkt. No. 30 ("FAC") at ¶ 26. According to the FAC, CCA has "embraced a politically charged agenda," which "includes a virulent hostility to Israel." *Id.* at ¶¶ 31, 54. Because of this claimed hostility, Plaintiff contends that CCA has (1) discriminated against her based on her religious beliefs, ethnicity, and ancestry regarding the State of Israel as a Jewish state and (2) created a hostile work environment *See generally id.* Plaintiff's allegations turn on events that occurred beginning in Fall 2023.

The FAC explains that on October 7, 2023, armed members of the terrorist group Hamas

---

[1] For purposes of this background section, the Court accepts the factual allegations as true, and construes the FAC in the light most favorable to Plaintiff, as it must as this stage. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

committed a violent attack on southern Israel, killing 1200 people and kidnapping 200 others. *See id.* at ¶¶ 57–58. A few days after the attack, CCA's Critical Ethnic Studies program posted a photograph on its official CCA Instagram account showing a pro-Palestinian march and a sign reading "DECOLONIZATION IS NOT A DINNER PARTY." *See id.* at ¶ 60; *see also* Dkt. No. 30-6, Ex. F. The photograph was accompanied by a statement that the Critical Ethnic Studies Program "has a stellar record of teaching the historical and contemporary context of Israel's colonial legacy in Palestine," and that the Program "affirms the right of Palestinians to advocate for their self-determination." *See id.* The post also stated:

> You cannot use the term "decolonize" without recognizing the toxicity and violence of settler colonialism. Decolonization is not a metaphor. Solidarity is not passive.
>
> . . .
>
> Collective resistance is the only path toward liberation.

*Id.*

Plaintiff states that "[t]he content of the Instagram text appears to be a thinly veiled justification for the rape, torture, beheading and brutal murders of Jews in Israel by Hamas." *See id.* at ¶ 65; *see also* Dkt. No. 30-7, Ex. G. The post was "liked" by multiple administrators and members of the CCA faculty, including the Dean of the Humanities and the Sciences, the Dean of Fine Arts, and the Senior Director of Faculty Affairs in the Provost's office. *See* FAC at ¶ 61. Plaintiff filed a complaint with the College regarding this post and the ratification of its message by CCA departments and leadership. *See id.* at ¶ 65; *see also* Dkt. No. 30-7, Ex. G.

Human Resources initially responded to the complaint without taking further action. *Id.* at ¶ 66; Dkt. No. 30-8, Ex. H. It stated in relevant part:

> The College believes that free inquiry and expression are at the heart of every academic community. While firmly rejecting hate speech, antisemitism, and Islamophobia, we also recognize there may be a spectrum of views on any given topic—and that diverging opinions on substantive issues can coexist. We understand that not everyone will agree with this approach. Our focus continues to be on modeling productive and respectful disagreement within our diverse community, while preventing direct harm to individuals or groups of

|   |   |
|---|---|
| 1 | people by avoiding personal attacks. |
| 2 | Dkt. No. 30-8, Ex. H. |

Plaintiff alleges that CCA only took down the post and began an outside investigation into it months later after a CCA donor published concerns about the Instagram post and the College's inadequate response to it. *See id.* at ¶¶ 67–68. Plaintiff met with the outside investigators in January 2024. *See id.* at ¶ 68. In February 2024, HR informed Plaintiff that the investigators had concluded that no CCA policies or applicable laws had been violated. *Id.* at ¶ 69; *see also* Dkt. No. 30-10, Ex. J. Despite these findings, HR said that CCA would not be reposting the Instagram post because it "did not advance CCA's goals related to inclusion and belonging." *Id.*

In response to the investigation findings and the dismissal of his own complaint about the Instagram post, another faculty member, Professor Emeritus Barry M. Katz, issued an open letter to the CCA community. *See id.* at ¶¶ 71–75; *see also* Dkt. No. 30-11, Ex. K. In it, he explained that in failing to acknowledge the "indiscriminate murder, rape, torture, decapitation, mutilation, and kidnapping of civilians" on October 7, the Instagram post "conveys an inescapable message: Jewish lives do not matter." *Id.* He further stated: "I remain convinced that the Chair's use of the platform of an academic program to promote a private political agenda is inconsistent with CCA's policies which are designed to protect our community while safeguarding academic freedom and constitutionally protected speech." *Id.*

A complaint was subsequently filed against Mr. Katz based on this letter. *See* FAC at ¶ 73. The complainants said that the letter had made them "feel unsafe, suffer from emotional distress and question how to complete their job duties in the hostile environment that has been created." *Id.* Plaintiff alleges that rather than respecting Mr. Katz's freedom of expression, as the College had done with the post from the Critical Ethnic Studies program, Mr. Katz was reprimanded for his letter, and his views were deemed "unprofessional, uncollegial and inappropriate." *See id.* at ¶¶ 74–75.

Plaintiff further contrasts CCA's support for the Instagram post with her own treatment by CCA. According to the FAC, on October 26, 2023, three members of the Students for Justice in Palestine student group ("SJP") staffed a table in a common hallway on campus displaying pro-

United States District Court
Northern District of California

Palestine artwork and QR codes. *See id.* at ¶¶ 79, 80. One handmade poster called for the "liberation of Palestine" "From the River to the Sea." *Id.* at ¶ 81. It included a map of Israel with the colors of the Palestinian flag over the entire country. *Id.* As Plaintiff walked through the hallway to her office, one of the students called Plaintiff over to their table. *Id.* at ¶ 80. One student requested that Plaintiff contact her government representatives to demand a ceasefire in Gaza. *Id.* The FAC alleges that Plaintiff was troubled by the "River to the Sea" sign because that "phrase is associated with the Palestinian nationalist movement, advocating for a free and independent Palestine from the Jordan River to the Mediterranean Sea, which encompasses the entirety of historic Palestine, including what is now Israel." *Id.* at ¶ 81. Plaintiff asked the students if she could take a picture of the display and they said yes. *Id.* at ¶¶ 82–83. Plaintiff states that she took a photograph of the sign because she wanted to understand whether it violated CCA policy. *Id.*; *see also* Dkt. No. 30-12, Ex. L.

One of the students told Plaintiff that "Hamas didn't have real weapons to commit the crimes they were accused of committing" on October 7, and that "even within Gaza, Hamas had no weapons." *Id.* at ¶ 85. In response to this, Plaintiff asked the students where they got their news from. *See id.* at ¶ 86. One student, Maryiam Alwael, "explained that she was from the Middle East and therefore knew the real story there." *Id.* Plaintiff asked where in the Middle East she was from, and Ms. Alwael said she was from Kuwait. *Id.* Plaintiff "then brought up the challenges Palestinians faced in Kuwait, citing the deportation of over 300,000 Palestinians from Kuwait in 1991." *Id.* Ms. Alwael responded that she had no knowledge of these events. *Id.* Plaintiff then explained her own "deliberate consumption of varied news sources and academic viewpoints to guard against the echo chamber effect perpetuated by social media." *Id.* at ¶ 87. Ms. Alwael stated that she liked her echo chamber, so Plaintiff walked away rather than engage further. *Id.*

A few weeks later, CCA's Director of Human Resources, Suzanne Guevarra, informed Plaintiff that Ms. Alwael had filed a complaint against her. *See id.* at ¶¶ 91–92; *see also* Dkt. No. 30-13, Ex. M. Plaintiff never received a copy of the complaint and was not present when Ms. Alwael or the other two students from the SJP table were interviewed. *Id.* at ¶¶ 96–98. In

4

December 2023, Plaintiff was informed by letter that CCA had found that she had violated three provisions of the CCA handbook. *See id.* at ¶¶ 102–103; *see also* Dkt. No. 30-14, Ex. N. CCA concluded that Plaintiff had "engaged in improper verbal conduct" and took photographs of the table, which "made the students feel threatened." *See* Dkt. No. 30-14, Ex. N. Specifically, the letter explained that "[t]he nature and tone of the statements by you caused the students to reasonably believe that you were using your positional power as a Professor to get the outcome you sought, which was for the students to agree with your point of view." *Id.* CCA further found that Plaintiff had "engaged in prohibited discriminating behavior by your verbal conduct to the student Maryiam Alwael" by "explaining the history of Maryiam's country to her" and telling the students that they "live in an echo chamber." *Id.*

The letter laid out "Disciplinary Measures," including a requirement that Plaintiff take Supporting Diversity, Equity, Inclusion and Belonging training and re-take the Preventing Harassment & Discrimination training. *Id.* The letter also stated that "[y]ou must immediately cease this and similar behavior with any student or employee of the college and if you continue to do so again, you will remain subject to further disciplinary action that could result in discharge for cause." *Id.* Plaintiff suggests that CCA's conclusion appeared to rest entirely on the students' shared account of events, and did not consider Plaintiff's own witness who Plaintiff spoke with shortly after the encounter with the students. *See* FAC at ¶¶ 97, 99–101, 107–110. Plaintiff told CCA that she did not agree with the results of the investigation, but she was told there was no appeal process. *See id.* at ¶ 106.

Based on these allegations, Plaintiff brings causes of action for disparate treatment and hostile work environment under Title VII of the Civil Rights Act of 1964; Breach of Contract; as well as violations of Title VI of the Civil Rights Act of 1964, California Education Code § 66270, and California Government Code § 12920. *See id.* at ¶¶ 147–209. Defendant has moved to dismiss the FAC, Dkt. No. 35, and to strike portions of Plaintiff's opposition brief, Dkt. No. 45.

## II.     MOTION TO DISMISS

### A.     Legal Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain

1  statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A

2  defendant may move to dismiss a complaint for failing to state a claim upon which relief can be

3  granted under Rule 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the

4  complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."

5  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule

6  12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible

7  on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible

8  when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that

9  the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

10  In reviewing the plausibility of a complaint, courts "accept factual allegations in the

11  complaint as true and construe the pleadings in the light most favorable to the nonmoving party."

12  *Manzarek*, 519 F.3d at 1031.  Nevertheless, courts do not "accept as true allegations that are

13  merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead*

14  *Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*,

15  266 F.3d 979, 988 (9th Cir. 2001)).

### B. Discussion

#### i. Title VII

Plaintiff brings claims under Title VII for both disparate treatment and hostile work environment.  *See* FAC at ¶¶ 147–60.  Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges" or "to limit, segregate, or classify [] employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [her] status as an employee" because of employment because of her religion or national origin.  42 U.S.C. § 2000e-2(a).

##### a. Disparate Treatment

To establish a prima facie case of disparate treatment under Title VII, "a plaintiff must offer evidence that give[s] rise to an inference of unlawful discrimination."  *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 690 (9th Cir. 2017) (quotation omitted).  To do so, a plaintiff may

"produce direct or circumstantial evidence demonstrating that a discriminatory reason 'more likely than not motivated' the employer." *Id.* at 691. Alternatively, a plaintiff may satisfy the elements of the framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, a plaintiff must establish that "(1) the plaintiff belongs to a protected class, (2) [s]he was performing according to h[er] employer's legitimate expectations, (3) [s]he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Id.*

Defendant first argues that Plaintiff has not alleged that she suffered any adverse employment action. *See* Dkt. No. 35 at 5–7. Defendant points out that Plaintiff remains a tenured professor at CCA. *See id.*; *see also* FAC at ¶ 26. However, the Ninth Circuit has broadly construed what constitutes an adverse employment action, and it is not limited to the firing of employees. *See Ray v. Henderson*, 217 F.3d 1234, 1240–1244 (9th Cir. 2000). "[A]n adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018) (quotation omitted).

Plaintiff alleges that she was ultimately disciplined for speaking to the SJP students, including receiving a warning letter that she could be terminated if she engaged in such conduct again with any CCA students or employees. *See* FAC at ¶ 105. Despite Defendant's suggestion otherwise, the Ninth Circuit has explicitly stated that "[a] warning letter [] constitutes an adverse employment action . . . ." *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 848 (9th Cir. 2004); *cf. Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (finding "undeserved performance ratings" may constitute adverse employment action). Construing the FAC in the light most favorable to Plaintiff at this stage, the threat of termination in the warning letter could, even on its own, alter the terms and conditions of Plaintiff's employment. *Accord Van v. Black Angus Steakhouses, LLC*, No. 5:17-CV-06329-EJD, 2018 WL 6069815, at *7 (N.D. Cal. Nov. 20, 2018) (finding "formal warnings to Plaintiff that discipline or termination could result if she did not improve her performance" constituted adverse employment action).

And here, Plaintiff additionally alleges that she "has been left fearful that any step she takes relating in any way to Israel, the Middle East, or a Muslim student will be the basis for further discipline, a finding of wrongdoing, and punishment, including dismissal." *See* FAC at ¶ 116; *see also id.* at ¶ 134. As an illustration of this fear and the resulting problems Plaintiff has faced in performing her normal job responsibilities, Plaintiff alleges that following CCA's finding of wrongdoing against her, she had a series of problematic interactions with a student but the College has failed to assist. *See id.* at ¶¶ 117–123. Plaintiff contends that the student demanded that she receive a high grade in Plaintiff's class based on the religious views expressed in her work rather than on the quality of the work itself. *See id.* at ¶¶ 118–119. When Plaintiff repeatedly asked Defendant for advice on how to proceed, and asked for another faculty member to assist, Defendant refused. *Id.* at ¶¶ 117, 120–123. These allegations are sufficient to plead that Plaintiff suffered an adverse employment action.

Defendant also argues that Plaintiff has not alleged that similarly situated individuals outside her protected class were treated more favorably. *See* Dkt. No. 35 at 6–7. To satisfy this element, Plaintiff "must identify employees outside her [religion] and [ethnicity] who were similarly situated to her in all material respects but who were given preferential treatment; they must have similar jobs and display similar conduct." *See Campbell*, 892 F.3d at 1015. Plaintiff responds that the faculty members who posted and "liked" the Instagram post are similarly situated and were treated preferentially to her. *See* Dkt. No. 38 at 4–5.

In the FAC, Plaintiff alleges that "Defendant treated Plaintiff differently from, and worse than, the way it treated others who do not share Plaintiff's ancestral, ethnic and religious commitments." FAC at ¶ 151; *see also id.* at ¶ 172 ("CCA's actions, inactions, and conduct were, and continue to be, intended to treat Dr. Fiss differently as a Jewish faculty member as compared to other similarly situated non-Jewish and/or non-Israeli faculty."). As an example of this, Plaintiff points to the Critical Ethnic Studies program Instagram post, which was "liked" by CCA faculty, including other professors. *Id.* at ¶¶ 60–61. Plaintiff also lists some of these individual members in the FAC by name and includes their titles. *See id.* at ¶ 61. She and another Jewish professor, Mr. Katz, filed complaints about the post and the CCA faculty who approved of it. *See*

8

*id.* at ¶¶ 65, 71–74; *see also* Dkt. No. 30-7, Ex. G.  However, CCA concluded that the post and those individuals did not violate the College's policies.  *Id.* at ¶¶ 69, 111.

        Defendant disputes whether endorsing the social media post and its message is sufficiently equivalent to Plaintiff's interaction with the SJP students, *see* Dkt. No. 44 at 4–5, but the Court declines the invitation to resolve such inherently factual disputes at this stage in the litigation.  Taken together and liberally construed, the Court finds that Plaintiff's allegations sufficiently plead a prima facie claim for disparate treatment.  The Court therefore **DENIES** the motion on this basis.

### b.  Hostile Work Environment

        Defendant similarly urges that Plaintiff has not provided sufficient allegations to support a claim of hostile work environment.  *See* Dkt. No. 35 at 7–9.  To state a claim for a hostile work environment under Title VII, a plaintiff must allege that (1) she was subjected to unwelcome verbal or physical conduct based on religion or ethnicity, and (2) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.  *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), *as amended* (Jan. 2, 2004).  The Ninth Circuit has explained that when evaluating such claims, "[c]ontext matters," and "[w]orkplace conduct is to be viewed cumulatively and contextually, rather than in isolation."  *Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 978 (9th Cir. 2023).

        At bottom, Defendant appears to challenge Plaintiff's interpretation of the Instagram post and whether its response was sufficient.  *See* Dkt. No. 35 at 8–9.  Defendant urges, for example, that the Instagram post "does not address Judaism or Zionism," and that it ultimately removed the post permanently.  *See id.*  But the meaning of the post and whether it actually created a hostile work environment is ultimately one for the factfinder, and not properly before the Court at this stage.  The Court finds that Plaintiff has sufficiently alleged for purposes of the motion to dismiss stage that both the timing and actual content of the post, as well as the College's response to it, contributed to a hostile work environment.  *See, e.g.*, FAC at ¶¶ 19, 30–31, 60–62, 116–124, 135–136.  Plaintiff additionally alleges that during a faculty meeting a faculty member called out "F*ck the Zionists" without any criticism or pushback, and in another incident, two other faculty

1  members complained about Jewish students reporting in course evaluations that the professors'
2  courses contained antisemitic content.  *See id.* at ¶ 50; *cf. Sharp*, 69 F.4th at 978–81 (noting that
3  conduct did not have to be directed at the plaintiff to give rise to a hostile work environment
4  claim).  The allegations supporting Plaintiff's hostile work environment claim are not
5  overwhelming, and it is a close call whether the alleged conduct alone, even assuming it
6  eventually can be proven, is sufficient to state a claim.  The fact that the alleged conduct occurred
7  on a college campus and in an academic setting will certainly influence whether Plaintiff can
8  ultimately support her claim.  Nevertheless, the Court finds that this claim is most appropriately
9  resolved after further factual development, with the benefit of an actual record as opposed to
10  allegations.  The Court accordingly **DENIES** the motion to dismiss on this basis.

        **ii.**    **Title VI**

Plaintiff similarly alleges that she has been discriminated against and harassed on the basis of her Jewish ancestry, race, ethnic characteristics, or national origin, in violation of Title VI.  *See* FAC at ¶¶ 161–177.  Title VI prohibits discrimination "under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Accordingly, to state a Title VI claim, "a plaintiff must allege that (1) the entity involved is engaging in [] discrimination; and (2) the entity involved is receiving federal financial assistance."  *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994), *overruled on other grounds by Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001).  However, 42 U.S.C. § 2000d–3 further limits the scope of Title VI:

> Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization *except where a primary objective of the Federal financial assistance is to provide employment*.

42 U.S.C. § 2000d–3 (emphasis added).  To bring a claim under Title VI against an employer for discriminatory employment practices, therefore, the primary objective of the federal financial assistance must be to provide employment.  *See Temengil v. Trust Territory of Pacific Islands*, 881

F.2d 647, 653 (9th Cir. 1989) (citing 42 U.S.C. § 2000d-3).[2]

Here, Plaintiff has alleged that "CCA receives financial assistance from the United States Department of Education . . . ." FAC at ¶ 162.  However, she has not included any allegations that the primary objective of this financial assistance is to provide employment.  Plaintiff makes no effort to address this requirement in her opposition brief, and her broad assertion that "Title VI applies so long as the institution itself receives federal funds," Dkt. No. 38 at 12, is simply incorrect.  The Court therefore **GRANTS** the motion as to this claim.

Defendant's additional arguments mirror those it raised in response to Plaintiff's Title VII claim.  *See* Dkt. No. 35 at 10–12.  The Court has addressed those arguments in Section II.B.i above, and similarly rejects them here.

### iii.   California Education Code § 66270

Plaintiff next brings a claim under California Education Code § 66270.  This specific statute provides:

> No person shall be subjected to discrimination on the basis of . . . nationality, race or ethnicity, [or] religion . . . in any program or activity conducted by any postsecondary educational institution that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid.

Cal. Educ. Code § 66270.

Defendant contends that Plaintiff lacks standing to bring a claim under this provision because it is only intended to protect students rather than members of an institution's faculty.  *See* Dkt. No. 35 at 12.  Defendant urges that other provisions of the Code make the limited application of the statute clear.  Specifically, the College points to § 66252, which is entitled "Right of students," and states in part that "[a]ll *students* have the right to participate fully in the educational

---

[2] Although on its face § 2000d-3 only refers to "action[s] by any department or agency," courts have still applied the statute's limitations to private rights of action. *See Temengil*, 881 F.2d at 653; *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1531, n.8 (10th Cir. 1995) (collecting cases).  Plaintiff, for her part, also appears to concede that § 2000d-3 applies to her Title VI claim.  *See* Dkt. No. 38 at 11 ("CCA attempts to shield itself behind the rule that a Title VI employment discrimination claim must allege that federal assistance supported the program at issue—a proposition with which Plaintiff does not quarrel.").

11

process, free from discrimination and harassment." Cal. Educ. Code § 66252(a) (emphasis added). Both Plaintiff and Defendant offer only a superficial analysis of this statutory interpretation question. *Compare* Dkt. No. 35 at 12, *with* Dkt. No. 38 at 13.

The Court interprets California statutes in accordance with California principles of statutory construction. *See Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1126 (9th Cir. 2005). When interpreting California law, the Court must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." *State Farm Mut. Auto. Ins. Co. v. Garamendi*, 32 Cal. 4th 1029, 1043 (Cal. 2004) (quotation omitted). "In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." *Id.* (quotation omitted). The Court may not, however, consider the statutory language in isolation. *Id.* Rather, the Court must "read every statute with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." *Id.* (quotation omitted).

When the Court considers the statute in context, as it must, it appears that it was specifically intended to protect students. Section 66270 is part of the Equity in Higher Education Act, whose purpose is to "afford all persons . . . equal rights and opportunities in the postsecondary educational institutions of the state." *See* Cal. Educ. Code §§ 66250, 66251. Consistent with this purpose, the Act includes a section detailing the "[r]ights of *students*" and the responsibilities that institutions have to ensure that students' educational rights and opportunities are safeguarded. *See* Cal. Educ. Code § 66252 (emphasis added). For example, the statute states:

- "All *students* have the right to *participate fully in the educational process*, free from discrimination and harassment." *Id.* at § 66252(a) (emphasis added).
- "California's postsecondary educational institutions have an affirmative obligation to combat discrimination . . . and a responsibility to *provide equal educational opportunity*." *Id.* at § 66262(b) (emphasis added).
- "Harassment directed at an individual on the basis of actual or perceived characteristics or status may create a hostile environment and *jeopardizes equal*

1   *educational opportunity . . . .*" *Id.* at § 66252(c) (emphasis added).

2   - "There is an urgent need to *teach and inform students about their rights . . . .*"
3   *Id.* at § 66252(e) (emphasis added).

4   - It is the intent of the Legislature that each postsecondary educational institution
5   undertake educational activities to counter discriminatory incidents on campus and,
6   within constitutional bounds, to minimize and eliminate a hostile environment on
7   campus *that impairs the access of students to equal educational opportunity*." *Id.*
8   at § 66262(f) (emphasis added).

9   - "It is the intent of the Legislature that each postsecondary educational institution
10  undertake supportive measures *to help students* who have encountered harassing or
11  discriminatory incidents, regardless of the location of the harassing or
12  discriminatory incident, *to ensure students' access to equal educational*
13  *opportunities*." *Id.* at § 66252(g) (emphasis added).

Although at times the Act refers to "persons" and not simply "students," it is in the context of discussing the protection of their educational opportunities. This is consistent with how courts have interpreted the elements of a claim under § 66270, which includes that "he or she suffered severe, pervasive and offensive harassment, that *effectively deprived plaintiff of the right of equal access to educational benefits and opportunities . . . .*" *See Videckis v. Pepperdine Univ.*, 100 F. Supp. 3d 927, 935 (C.D. Cal. 2015) (emphasis added) (citing *Donovan v. Poway Unified Sch. Dist.*, 167 Cal. App. 4th 567, 579, 603–05 (Cal. Ct. App. 2008)). Plaintiff has not cited, and the Court has not found, a single case in which a non-student brought a claim under § 66270. But even assuming § 66270 could apply to anyone, Plaintiff must still allege that she was deprived of the right of equal access to educational benefits and opportunities as a result of the alleged discrimination. She has not done so, and as a faculty member rather than a student, it is not clear that she ever could. The FAC simply asserts that "[t]he discrimination has detrimentally affected Plaintiff" and she "has suffered and will continue to suffer damages." *See* FAC at ¶¶ 181, 189. The Court therefore **GRANTS** the motion to dismiss this claim.

//

### iv. FEHA

Plaintiff also brings a claim under California's Fair Employment and Housing Act ("FEHA"), California Government Code § 12920, for disparate treatment and hostile work environment. *See* FAC at ¶¶ 191–202. In addition to raising the same substantive arguments that the Court has already rejected under Title VII, *see* Section II.B.i above, Defendant also argues that Plaintiff failed to exhaust her administrative remedies, Dkt. No. 35 at 13. Defendant points out that to bring a FEHA claim, Plaintiff must file a complaint before the Department of Fair Employment and Housing ("DFEH"). *See Okoli v. Lockheed Tech. Operations Co.*, 36 Cal. App. 4th 1607, 1613 (Cal. Ct. App. 1995). In her opposition brief, Plaintiff responds that she has obtained a right to sue letter from the California Civil Rights Department and attaches it as an exhibit. *See* Dkt. No. 38 at 14; Dkt. No. 38-2, Ex. A. Although it now appears clear that as a factual matter Plaintiff has exhausted her administrative remedies, she did not allege this in the FAC, and she cannot amend the complaint through her opposition brief. The Court therefore **GRANTS** the motion to dismiss this claim on this basis.

In a passing sentence in the complaint, Plaintiff also suggests that Defendant violated "the California Labor Code." *See* FAC at ¶ 200. Plaintiff provides no additional detail about what provisions of the Labor Code she believes Defendant violated, and she does not address this argument at all in her opposition brief. The Court therefore **GRANTS** the motion to dismiss any California Labor Code claim to the extent Plaintiff has attempted to bring such a claim.

### v. Breach of Contract

Lastly, Plaintiff brings a breach of contract claim based on Defendant's Policy on Discrimination and Unlawful Harassment. *See* FAC at ¶¶ 203–209. To state a claim for breach of contract, Plaintiff must allege (i) the existence of a contract; (ii) Plaintiff's performance under the contract or excuse for nonperformance; (iii) Defendant's breach; and (iv) damages to Plaintiff as a result of the breach. *See, e.g.*, *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (Cal. Ct. App. 2014).

Here, Plaintiff alleges that Defendant breached its contract with her "by failing to conduct an effective, thorough, or objective investigation of the complaints against her," particularly by

14

failing "to properly consider and weigh the testimony" of Plaintiff's own witness. *See* FAC at ¶ 207. Plaintiff further alleges that as a result she "suffered damages." *Id.* at ¶ 208. However, as Defendant points out, Plaintiff has not pled any facts establishing the existence of a contract between Plaintiff and Defendant. She cites various provisions of Defendant's Policy on Discrimination and Unlawful Harassment, but does not explain either in the FAC or in opposition how this constitutes an enforceable contract. If, for example, Plaintiff believes that this policy is a part of her employment contract with Defendant, she must allege so.

Defendant also points out that Plaintiff has not pled any compensable damages resulting from the alleged breach. Dkt. No. 35 at 14. Plaintiff suggests that she has requested injunctive relief, including the removal from her employment file of a threat to terminate her if she engages in similar conduct in the future. *See* Dkt. No. 38 at 15. Specific performance is only available where a plaintiff has shown: "(1) the inadequacy of [her] legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract." *See Tamarind Lithography Workshop, Inc. v. Sanders*, 143 Cal. App. 3d 571, 575 (Cal. Ct. App. 1983). Plaintiff has not made such a showing.

The Court **GRANTS** the motion to dismiss this claim as well.

### III.    MOTION TO STRIKE

#### A.    Legal Standard

Federal Rule of Civil Procedure 12(f) provides that a court may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are regarded with disfavor because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice." *Z.A. ex rel. K.A. v. St. Helena Unified Sch. Dist.*, No. C 09-03557 JSW, 2010 WL 370333, at *2 (N.D. Cal. Jan. 25, 2010). "Where there is any doubt as to the relevance of the challenged allegations, courts generally err on the side permitting the allegations to stand . . . ." *See id.* (citing *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517, 534

1  (1994)). This is particularly true when the moving party shows no prejudice and when striking the
2  allegations will not streamline the ultimate resolution of the action. *Id.*

### B. Discussion

Defendant has filed a motion to strike four specific statements from Plaintiff's opposition to the motion to dismiss.[3] Dkt. No. 50. Defendant urges that they reflect "inaccurate characterizations of CCA's 'official orthodoxy,'" are inflammatory, and should therefore be stricken. *Id.* But they constitute Plaintiff's interpretation of Defendant's alleged conduct and messaging, and as such, are relevant to her claims. The Court understands that this case involves sensitive issues, but the Court need not—and indeed should not—decide whether and to what extent the allegations in the complaint and as discussed in Plaintiff's opposition brief are true. The Court therefore **DENIES** the motion to strike.

## IV. CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss. Dkt. No. 35. As discussed above, the Court **GRANTS** the motion as to all but Plaintiff's Title VII claims. The Court also **DENIES** the motion to strike. Dkt. No. 45.

//
//
//
//
//
//
//
//
//

---

[3] To the extent Defendant filed separate evidentiary objections to the motion to strike, Dkt. No. 50, this was improper. Under the Local Rules, "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum." *See* Civil L.R. 7-3(a). The Court therefore **STRIKES** Dkt. No. 50 from the docket. The Court cautions Defendant that moving forward, the Court expects it to fully comply with the Local Rules.

1 At this stage in the litigation, the Court cannot say that amendment would be futile. Plaintiff may therefore file an amended complaint within 21 days of the date of this order. The Court further **SETS** case a case management conference on March 4, 2025, at 2:00 p.m. The hearing will be held by Public Zoom Webinar. All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg. The parties are further **DIRECTED** to file a joint case management statement by February 25, 2025.

**IT IS SO ORDERED.**

Dated: 1/14/2025

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge