Lori Lowenthal Marcus* (PA 53388)
Jerome Marcus* (PA 50708)
THE DEBORAH PROJECT
P.O.B. 212
Merion Station, PA 19066
Telephone: (610) 880-0100
lorilowenthalmarcus@deborahproject.org
jmarcus@deborahproject.org

*Attorneys for Plaintiff*
KAREN FISS

*Admitted Pro Hac Vice*

JAVITCH LAW OFFICE
Mark L. Javitch (CA 323729)
3 East 3rd Ave. Ste. 200
San Mateo, CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 648-0705
mark@javitchlawoffice.com

*local counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT FOR

## THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN FISS,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>CALIFORNIA COLLEGE OF THE ARTS,<br><br>　　　　Defendant, | Case No.:  4:24-cv-03415-HSG<br><br>**SECOND AMENDED COMPLAINT** |

PLAINTIFF KAREN FISS, by and through her undersigned counsel, alleges as follows:

1.　　　　This is an action brought by Plaintiff Dr. Karen Fiss to remedy the breach of her right to teach within an academic institution that upholds the doctrine of intellectual freedom and to address unlawful employment discrimination based on religion and ethnic origin in violation of Title VII of the Civil Rights Act of 1964.

2.　　　　The acts, omissions, policies, and practices at California College of the Arts ("CCA" or "the College"), directed by the College's leadership, have transformed CCA from an

academic arts institution focused on developing students into "versatile makers with inventive solutions to advance culture and society," into an ideologically orthodox factory enforcing a single acceptable view–which is anathema to the Plaintiff and a great many other Jews– on  issues relating to the Jewish people, the State of Israel, the land of Israel, and the history of the Middle East.

3.      Dr. Karen Fiss is a full professor at CCA who has experienced discrimination in the form of disparate treatment and a hostile work environment as a result of these policies and practices, infringing upon her rights under Title VI, Title VII, under California law and as well as under her contractual agreement with CCA.

4.      The deliberate transformation of the CCA campus into a political battleground underscores a concerning trend where the Middle East conflict is a constant presence in the academic life of every member of the CCA community, whether faculty, student or administration. From the moment one steps onto campus, the relentless energy focused on this issue is palpable. However, what is particularly troubling is the one-sidedness of the rhetoric, whereby the Jewish State is consistently vilified and delegitimized. Members of the College community are effectively forced into a position where they must either align with the prevailing narrative or risk ostracism.

5.      CCA's enforcement of the view that the Jewish State is genocidal and illegitimate, devoid of its inherent right to self-defense or existence, is a calculated assault on intellectual diversity and academic freedom. The steps and mechanisms described in this Complaint are intended to, and do in fact, stifle dissenting voices and undermine the very foundation of scholarly inquiry and discourse.

6.     Because Dr. Fiss's beliefs do not align with the creed mandated and enforced by the College, she has suffered repeated and severe adverse treatment by CCA, which has dramatically impeded her ability to function as a scholar.

7.     As part of its policy of enforcing ideological conformity about Israel, CCA has threatened Dr. Fiss with dismissal for two reasons: (1) her refusal to comply with student demands to contact her congressional representatives to pressure Israel—a sovereign nation—to cease its military response to an ongoing threat; and (2) for respectfully challenging this monopolization of discourse and reaffirming the principles of open dialogue and open debate within CCA.

8.     These threats were conveyed by CCA through its internal disciplinary procedures, which it has used to suppress any expression—including Dr. Fiss's expression—supportive of Israel's right to exist as a Jewish State.

9.     Jewish students have been harassed by faculty and fellow students in the classroom for not supporting this dominant ideology.  They have been pressured to join pro-Palestinian and pro-Hamas walk-outs during class hours. Their Jewish identity and divergent political opinions have been silenced in classroom discussions through intimidation by professors and students alike, as well as by the infliction of other forms of harassment, and they have experienced isolation and ostracism from peers in campus life.

10.     Students are made fully aware of the antisemitic political views held by their professors and some administrators in class, and through the public protests and social media posts by CCA professors on their CCA social media accounts.

11.     Moreover, faculty members, including Dr. Fiss, who challenge this sanctioned narrative are subjected to ongoing threats of disciplinary action, up to and including dismissal.

This hostile environment extends beyond the classroom, where Jewish students and faculty members face harassment, coercion, and isolation for their identity and political beliefs.

12.    CCA's reluctance to address this mendacity among its faculty and students further exacerbates the situation. Instead of nurturing open dialogue and diverse perspectives, the institution perpetuates a culture of fear and intolerance.

13.    Multiple Jewish students have confidentially approached Dr. Fiss as well as another Jewish colleague about their experiences of antisemitic discrimination at CCA. These students are too intimidated to come forward on their own. With the promise of remaining anonymous, two Masters of Fine Arts students who had confided in Professor Fiss agreed to speak confidentially with the Vice President of Diversity, Equity, Inclusion and Belonging Tricia Brand about their antisemitic experiences at the College. As a result, CCA is aware of the experiences of these students. But despite this notice, the College has taken absolutely no action to abate any of the problems these students called to CCA's attention.

14.    Several non-Jewish students with whom Dr. Fiss has friendly relations confided to her that although they are Muslim by birth and come from Muslim countries, they were called Islamophobic by CCA students for being critical of the October 7 Hamas attacks on Israel. These students, like Dr. Fiss, have learned not to publicly express their own views about the Middle East when on the CCA campus.

15.    One Jewish student attempted to obtain support from the administration after a professor began using the classroom to advocate for antisemitic ideology rather than teach the course topic. Her concerns were not addressed, the professor not disciplined, and the student dropped the class and replaced it with an "independent study," a response which meant that student was deprived of learning the course material and turned out to learn on her own, which is

not what CCA promises its students. That Jewish student was told to talk to the chair of her program. But because the chair was himself constantly posting anti-Zionist messages on his personal Instagram account, the student did not feel comfortable or believe that it would be productive—indeed, it was likely to lead to still further harassment—in any way to approach this professor about her concerns.

16.     This student is trapped in an untenable situation, subjected to a constant stream of biased and one-sided rhetoric against the State of Israel and Jews within the classroom. Because of her belief in the fundamental right of Israel to exist as a Jewish State, she finds herself muzzled and marginalized, forced to endure a hostile environment rather than risk reprisal for speaking out. But that student has been silenced, having to choose to remain in a hostile environment rather than complain and then again be deprived of course material which she came to CCA to obtain and for which she paid.

17.     This student's experience at CCA serves as a glaring illustration of the pervasive hostility towards Israel's identity as a Jewish State and any expression of Jewish support for it. This hostility is not only condoned but actively enforced through CCA's disciplinary policies, which effectively suppress any dissenting voices on Middle East-related issues. Students and the administration exploit these policies to ensure ideological conformity, leaving no room for divergent perspectives within the CCA community. Consequently, Jewish students and faculty who uphold a commitment to Judaism and/or Zionism are consistently marginalized and subjected to hostility on the basis of their ancestry, ethnicity and religion, and all of the conduct at issue in this case constitutes discrimination against the Plaintiff because of her ancestry, ethnicity and religion.

18.     Such systemic discrimination not only undermines academic freedom but also contradicts the principles of intellectual diversity that should be fundamental to any educational institution. This student's experience is just one manifestation of the omnipresent hostility to Israel's existence as a Jewish State, and to any Jewish commitment to Israel, which is a constant presence at CCA, maintained with the full knowledge and intent of CCA's administration.  That hostility is mandated by CCA's disciplinary policy, as that policy is actually applied to any effort to exercise academic freedom by speaking freely and by seeking to provide explanation about the Middle East from a position contrary to CCA's enforced ideology.  That disciplinary policy, in turn, can be and is invoked by students, and adjudicated by CCA administration, as an ideological enforcement tool to ensure that no-one—student or faculty—is permitted to publicly manifest opinions at odds with the CCA orthodoxy.  The result is an environment relentlessly hostile to those Jewish students and faculty who share a commitment to Israel and Zionism.

19.     Dr. Fiss's commitment to Israel is, for her and the vast majority of Jews, an essential component of her religious commitment as well as of her ethnic identity and national ancestry.  The Jewish people have, for thousands of years, been committed to the land of Israel.  That commitment is manifest in the Jewish canon—the Torah, Prophets and Writings (which form what are referred to in the West as the Old Testament), the Talmud, Jewish law and Jewish liturgy—as well as in a plethora of Jewish customs, Jewish foods, the Jewish calendar and the Hebrew language.

20.     As a result, the United States Department of Education, Office of Civil Rights, has recognized that discrimination against Zionism and Zionists is a form of antisemitism, because it constitutes discrimination against Jews on the basis of their ethnic identity, national origin and national ancestry.

21.     The United States Department of Education, Office of Civil Rights, has issued at least two determinations that discrimination against individuals on the basis of their commitment to Zionism constitutes discrimination on the basis of shared ancestry, and is therefore a violation of Title VI.

22.     Thus, a letter ruling from the U.S. Department of Education, Office For Civil Rights, issued April 3,2023, to the University of Vermont and State Agricultural College, determined that anti-Zionist conduct constitutes a violation of the rights of Jewish students under Title VI because it constitutes discrimination on the basis of shared ancestry and, therefore, national origin discrimination. A true and correct copy of the letter ruling is attached hereto as Exhibit A.

23.     That letter identified as "antisemitic" a series of tweets by a University of Vermont faculty member.  None of the tweets contained the word "Jew" or Jewish."  Instead, their antisemitic content consisted of repeated denunciations of Zionism and Zionists, such as "its [sic] good and funny" "for me, a TA, to not give Zionists credit for participation;" "why do so many Zionists work for the writing center[?];" "I get the indelible [sic] surge [sic] to cyber bully" when receiving "posts from UVM Zionist Instagram accounts;" and  "serotonin rush of bullying Zionists on the public domain."

24.     Similarly, on December 13, 2022, the U.S. Department of Education, Office for Civil Rights issued a Notice advising that impermissible discrimination against Jews "on the basis of national origin (shared ancestry)" would be proven by facts demonstrating that "University-recognized student organizations passed a bylaw against inviting speakers who support 'Zionism, the state of Israel, and the occupation of Palestine."  See Exhibit B.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over this controversy under 28 U.S.C. §1331 as this Complaint states claims arising under federal law, and pursuant to 28 U.S.C. §1367 as this Complaint states ancillary claims arising under state law.

26.    Venue lies in this district pursuant to 28 U.S.C. §1391, as the Defendant resides in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## DIVISIONAL ASSIGNMENT

27.    Pursuant to Civil L.R. 3-2(c) and 3-5(b), this action should be assigned under Civil L.R. 3-2(c) and (d) to the San Francisco or Oakland division because it arose in San Francisco County, CA.

## PARTIES

28.    The Plaintiff in this case, Dr. Karen Fiss, is a full professor, tenured faculty member in History of Art and Visual Culture at CCA. In 1995, Fiss received her PhD with Distinction from Yale University in History of Art.

29.    Dr. Fiss's research examines the visual production of national identity from the 1930s under fascism to the current practice of "nation branding." Fiss examines how such soft power practices shape social, artistic and built environments, with a particular focus on how citizenship and historical memory are commodified and visually produced.  Her expertise, her scholarship and her teaching are focused on the political content of art, and the use (and abuse) of art as a tool to advance political agendas.

30.    Dr. Fiss is an internationally recognized scholar in her field.  Over her nearly forty-year career, she has published three books, over twenty articles, and has been awarded

prestigious grants and fellowships, including from the NEH, the Getty Foundation, the Graham Foundation, The Center for the Advanced Study in the Visual Arts, National Gallery, and the Deutscher Akademischer Austauschdienst.  Dr. Fiss has also served in a number of prestigious professional roles: as chair of the USA Artists Selection Panel; grant reviewer for the NEH, Getty Grant programs and SSHRC Canada grant cycle; Program Reviewer for UC Berkeley Advisory Board for New Directions in Contemporary Art Series for Lund Humphries Publishing, London; manuscript reviewer for Yale University Press, University of Chicago Press, University of California Press, as well as scholarly journals, among other professional roles and honors. She has also served as a mentor to junior colleagues, and as an "Immigrant Artist Mentor" for a New York Foundation for the Arts program.

31.     Dr. Fiss has presented invited lectures and keynote addresses internationally including at Columbia University, USC, Museum of Contemporary Art, Los Angeles, nGbK Berlin, and the Museo Reina Sofia, Madrid. She has curated exhibitions in the United States and abroad.  Among her projects, Dr. Fiss served as the film curator for the Museo Reina Sofia, Madrid, for the exhibition and film program commemorating the 75th Anniversary of the Spanish Civil War and Picasso's Guernica; and was co-curator with Kymberly Pinder (Dean Yale School of Art) of the exhibition *Necessary Force: Art in a Police State* (Art Museum of the University of New Mexico, Albuquerque, September 11 – December 12, 2015), which interrogated law enforcement's longstanding history of violence, and the systemic forces that continue to sanction and promote the violation of civil rights of people of color.  The curriculum vitae of Dr. Karen Fiss is attached hereto as Exhibit C.

32.     Dr. Fiss is committed to the existence of the State of Israel as a Jewish state, and to the concept of Zionism as the national liberation movement of the Jewish people.  These

commitments are rooted in, and are indeed elements of, Dr. Fiss's religious belief as well as her ancestry and her ethnic identity.

33.     The commitment of the Jewish people – as a people and not merely as a religion – to the land of Israel is a commitment manifest in Jewish religious belief, in the shared ancestry of Jewish people, and in Jewish ethnic identity.  It is rooted in Jewish canonical texts, in Jewish belief, in Jewish customs, and the Jewish calendar.

34.     Defendant California College of the Arts, founded in 1907, holds itself out to be a college focused on the training of artists and art scholars.  It maintains its principal place of business at 1111 8th Street, San Francisco, CA. 94107.

## FACTUAL ALLEGATIONS

35.     CCA has historically extended its curriculum to both scholars of art and practitioners of art and craft.  However, the institution has now overwhelmingly embraced a politically charged agenda, sacrificing academic diversity and artistic freedom. The curriculum is saturated with ideological content, with 30 Critical Ethnic Studies faculty and numerous Humanities & Science faculty in Critical Studies, Writing, and History of Art and Visual Culture pushing a singular political viewpoint and that viewpoint includes a virulent hostility to Israel, the homeland of the Jewish people which is a central thread of Judaism and to the concept of Zionism as the national liberation movement of the Jewish people.

36.     Many studio art faculty, traditionally champions of diverse techniques and visions, also conform to this rigid political orthodoxy and bring it into their classrooms. This shift stifles creative expression and undermines the comprehensive art education that CCA once offered, reducing the institution to an echo chamber of uniform thought.

37.     The official position taken by CCA, deeming the centrality of Israel as the homeland of the Jewish people and support for Israel's existence as a Jewish State as illegitimate, constitutes a glaring manifestation of institutionalized antisemitism. This stance has fostered a toxic and discriminatory environment, systematically targeting Jewish individuals based on their political and ethnic identity. Jewish students and faculty are subjected to pervasive marginalization and ostracization solely for their beliefs and heritage. Voices advocating for Israel, including Plaintiff's, are aggressively silenced, and expressions of Jewish identity are met with overt hostility and intolerance.  The instances of discrimination against Plaintiff at issue in this case are examples of, and manifestations of, these CCA policies.

38.     This entrenched bias not only violates fundamental principles of equality and academic freedom but also perpetuates a climate of fear and exclusion for Jewish members of the community. It undermines meaningful discourse and critical inquiry, essential elements of any academic institution, while callously disregarding the rights and dignity of individuals based on their cultural and political affiliations. By promoting a singular political narrative and vehemently delegitimizing all pro-Israel perspectives, CCA actively contributes to the propagation of antisemitic attitudes and stereotypes.

39.     The institutionalized and enforced hostility to Plaintiff's religious beliefs and her ethnic and ancestral identity thus caused the multiple acts of discrimination described in this Amended Complaint and severe and pervasive discrimination against Plaintiff on the basis of her religion, ethnicity and ancestry.

40.     The repercussions of this discriminatory behavior are profound and far-reaching, directly undermining the academic freedom, personal security, and ethnic identity of Jewish individuals, including Dr. Fiss. CCA's complicity in fostering an antisemitic environment not

only stains its reputation but also exposes it to legal liability for flagrant violations of laws protecting individuals from discrimination based on political beliefs and ethnic identity.

41.    CCA has engaged in discriminatory practices in violation of applicable laws and regulations protecting individuals from discrimination based on political beliefs and ethnic identity. CCA's discriminatory practices flagrantly violate laws safeguarding individuals from discrimination based on political beliefs and ethnic identity. The institution's overt bias against Jewish students and faculty is evident through its actions and inactions, which have created an environment rife with prejudice and hostility.

42.    Specifically, CCA has issued statements condemning violence against numerous different minority groups.  Never, however, has CCA leadership addressed violence against Jews. CCA issued:

A.    at least three statements condemning the murder of George Floyd;

B.    another supporting the conviction of police officer Derek Chauvin;

C.    statements condemning targeted attacks on mosques in New Zealand;

D.    statements condemning anti-Asian hate and attacks in the wake of COVID

E.    a statement supporting the "Women, Life, Freedom" movement in Iran;

F.    a statement in support of Ukraine following the incursion into it by Russia;

G.    a statement on the shooting at a Buffalo, New York grocery store and a church in Orange county;

H.    a statement against shootings in Atlanta which involved six Asian women;

I.    a statement on Roe v. Wade and the Supreme Court;

> J.    a statement on the Supreme Court and Affirmative Action;
>
> K.    a statement on ICE Immigration policies;
>
> L.    a statement on Democratic wins in US presidential and senate elections.

43.    More than a dozen official statements were issued by CCA on topics about which the College sought to express either solidarity with individuals who had suffered violence or against major political or landmark legal decisions about which it sought to publicly express moral repugnance. Some of these statements addressed domestic issues, others were pronouncements about events that happened across the globe.

44.    When it came to violence committed against Jews, however, CCA had nothing to say. Even when attacks on Jews took place geographically near to CCA, no statement was issued. Jewish harm was of no importance and not even worthy of lip service to CCA.  Harm against any other minority, whether Black or Asian or undocumented immigrants or church goers or mosque attendees, commanded the attention of, and the issuance of public statements by, CAA.  But CCA completely ignored violence done to Jews:

> A.    CCA did not issue a statement when a Jewish man was killed while participating in a pro-Israel rally in nearby Thousand Oaks, California, on November 5, 2023;
>
> B.     CCA did not issue a statement when two Jews were shot leaving their houses of prayer in Los Angeles, one on February 15 and the next on February 16, 2023;
>
> C.    CCA did not issue a statement when a congregation full of Jews were held hostage in Colleyville, Texas on January 16, 2021;

D.      CCA did not issue a statement when, on April 27, 2019, a shooter entered

a synagogue on Shabbat which was also the last day of the Jewish holiday of

Passover, shooting several congregants and the rabbi, and killing one of the

congregants in Poway, California;

E.      CCA did not issue a statement when a gunman entered the Tree of Life

Synagogue in Pittsburgh, Pennsylvania on October 27, 2018, and murdered 11

people and wounded six, including several Holocaust survivors. This incident was

the single worst attack on Jews in America.

45.     On October 9, 2023, Dr. Fiss wrote to Tricia Brand on behalf of Jewish CCA

faculty and students who, Dr. Fiss explained, "are wondering when the CCA leadership will

issue and distribute a statement to the CCA community expressing solidarity with Jewish

students and those with ties to Israel and condemning the murderous attacks by Hamas on

innocent Israeli victims—many children and youth among them.

46.     In this communication, Dr. Fiss put CCA's leadership on notice—again—about

its failure to properly address the concerns and fears of the college's Jews:

> As we have discussed, CCA leadership failed to issue a statement of solidarity
> with Jewish students when the Pittsburgh Tree of Life murders took place, as well
> as multiple shooting attacks closer to home in California (Poway, Los Angeles,
> San Francisco). In contrast, it has issued statements of solidarity and support for
> tragic ethnic, religious and gender violence in Iran, New Zealand and elsewhere.
> As we previously discussed, I support those previous statements and also did my
> best as a faculty member to support those students suffering as a result of news of
> the violence in these countries.
>
> This email is attached hereto as Exhibit D.

47.     Instead of issuing a statement in support of the Jewish community expressing the

same kind of support and concern as that expressed on behalf of the many groups supported in

the statements referenced above in ¶36, following the deadliest attack on Jews since the

Holocaust, when more than 1200 people were murdered in southern Israel in less than two days beginning on October 7, 2023, many of whom were incinerated alive, shot repeatedly in their faces and genitals, raped to death, and more than 200 taken hostage into Gaza, CCA had this to say:

> Dear CCA Community,
>
> We all feel a lot of heaviness and grief about the horrific and devastating events that unfolded over the weekend in Israel and Gaza. We are especially concerned for those who fear for the welfare and safety of loved ones, those who've already lost loved ones to terror, and everyone whose safety is under threat because of their culture, their faith, and their hope for peace.
>
> CCA is a diverse and increasingly interconnected learning community. Faculty may be struggling with how to address this moment in their classrooms and studios. Students may be experiencing anxiety in a violent and uncertain world. In times of political crisis and war, we may be seeking spaces to grieve, to understand, and to find comfort in community. We recognize that although our college is small, those who are affected may not always be visible. However, we share in the collective pain of this moment and want to ensure that the community is aware of resources that are always available to you, should you choose to reach out.
>
> See Exhibit E.

48.     The overwhelming majority of CCA students and faculty vociferously express similar views on a variety of political topics, including the belief in the illegitimacy of the State of Israel as a Jewish State.

49.     Articulation of opinions inconsistent with this consensus by any member of the College Community is met at CCA by ostracism and by threats that the articulation of views in support of Israel will disqualify students from support by faculty; will disqualify or effectively prevent faculty from functioning as professional members of the CCA community; and may result in a faculty member's dismissal—even the dismissal of a faculty member, such as Dr. Fiss, with full tenure.

50.     CCA's repeated discrimination against individuals expressing support for Israel or identifying with Jewish identity constitutes a disturbing pattern of antisemitic behavior and a clear violation of Title VI and Title VII protections. Despite the prevailing narrative within the institution regarding the illegitimacy of Israel as a Jewish State, dissenting voices from Jewish individuals face disproportionate consequences. Students report social isolation, and even tenured faculty members like Dr. Fiss have faced threats of dismissal for expressing or acting on their beliefs.

51.     This pattern of discrimination has been documented through numerous accounts and incidents. Individuals expressing support for Israel have reported ostracism and hostility from their peers, and dissenting opinions have been met with censorship and professional repercussions. Such behavior undermines the principles of academic freedom and equality that Title VI and Title VII aim to protect.

52.     This institutionalized double standard not only violates federal and state law but is not only intellectually dishonest but also morally reprehensible. While viewpoints aligned with the CCA-approved antisemitic orthodoxy—even full-throated glorification of the horrific murders of Jews—are shielded under the pretext of academic freedom, dissenting perspectives are met with censorship and punishment. Such behavior not only stifles genuine intellectual discourse but also constitutes a profound betrayal of the principles of fairness and equality enshrined in Titles VI and VII.

53.     At the same time, articulation of views consistent with the CCA approved view not only by individual CCA faculty members but by entire CCA departments, acting in their official capacity as units of CCA, are deemed permissible as "academic freedom" even when

such views are hateful and interfere with the ability of others to participate in their academic opportunities at CCA.

54.     This official CCA adoption of the political position that any indication of Zionism, and support for Israel's existence are illegitimate, has resulted in an environment that is deeply and thoroughly hostile to any person, including Dr. Fiss, who holds a view inconsistent with the official CCA view.

55.     This hostile environment makes it impossible for Jewish members of the CCA community to reveal even their religious identity, much less a political commitment in support of the Jewish State to their fellow students or teachers.  Revelation of such an identity will result in such a student being tainted as a Zionist and, as an ineluctable result of such public identification, publicly denounced and shunned by students and abandoned by the faculty.

56.     A CCA faculty member has called out "F*ck the Zionists" in a faculty meeting, without encountering any criticism or a request to avoid such behavior. At another faculty meeting on December 10, 2021 (over Zoom), the Chair of Critical Ethnic Studies and another faculty member (Maxwell Leung) expressed their displeasure that in some of their course evaluations, some students were reporting that these professors' courses had antisemitic content. Rather than this issue be a cause for concern for the well-being of students, these professors were angry that the Jewish students were attempting to limit the faculty's "free speech," i.e. their "right to express antisemitism in the classroom."

57.     Students in Dr. Fiss's class have falsely informed her that "the Israeli Kibbutz movement wasn't real, it was just Israeli propaganda to seduce the Left," and have turned a class presentation on art into a call for the Boycott, Disinvestment and Sanctions movement against

Israel. Other papers submitted to Jewish faculty have included arguments that "Jews control the media" and that Jerusalem "belongs" only to Islam and the Palestinians.

58.     The relentless hostility at CCA has created an untenable situation for Jewish scholars like Dr. Fiss, who find themselves marginalized and ostracized within the academic community. The pervasive atmosphere of fear and intolerance has effectively silenced dissenting voices, particularly those identified as Zionists. Even faculty sympathetic to Israel dare not publicly associate with anyone labeled as a Zionist, fearing retribution.

59.     The same hostile environment makes it impossible even for a fully tenured professor such as Dr. Fiss to be able to function as a scholar within CCA as a community of scholars. The overwhelming majority of CCA faculty will refuse to engage with anyone labeled a Zionist, and the few who would be open to doing so, or who even share a commitment to Israel, are far too fearful to be willing to publicly engage with any person identified as a Zionist, such as Dr. Fiss.

60.     The toxic antisemitic and anti-Israel atmosphere at CCA is the deliberate creation of CCA leadership, who vociferously and unequivocally embrace "critical ethnic studies" which, at its foundation, is opposed to the state of Israel as a Jewish State. Indeed, although CCA is an arts college, the Critical Ethnic Studies department is now the largest humanities department in the school, with an outsized influence on CCA's political and ideological environment. There are 29 affiliated faculty members in California College of the Art's Critical Ethnic Studies department, but only ten in the painting department and eight in furniture. Because "critical ethnic studies" is the life blood of its political and therefore educational policies, no deviation from its political or religious orthodoxies is permitted at CCA.

61.     At CCA, the absence of Judaism in its purportedly inclusive "critical ethnic studies" program results in a clear double standard, and clear discrimination. While the institution professes to champion diversity and understanding, its failure to incorporate Jewish perspectives and experiences is evident. Jewish scholars like Dr. Fiss find themselves with their voices completely silenced in academic discourse.

62.     In promoting "critical ethnic studies," ostensibly aimed at challenging power structures and advocating for marginalized communities, CCA leadership has neglected the Jewish community entirely. By excluding Judaism from its guiding principles of equity and inclusion and willfully ignoring the millennia of global persecution and historical trauma which is an ineradicable element of the history of the Jewish people, the College perpetuates a narrative that dismisses Jewish experiences and concerns, effectively erasing their presence from discussions on ethnicity and identity.

### A.    CCA'S PRO-HAMAS INSTAGRAM POST

63.     On October 7, 2023, armed members of Hamas, an entity recognized as a terrorist organization by the United States as well as by Argentina, Australia, Canada, Israel, Japan, Paraguay, New Zealand, the United Kingdom, and the European Union, destroyed a fence constituting the border between Israel and Gaza, entered Israel, and attacked numerous Israeli towns.  During this attack, 1200 people in southern Israel were murdered, hundreds more were injured, and over 200 were kidnapped and taken hostage into Gaza, because Hamas believed those people were Jewish.  All of these actions were in clear violation of international law, which, in Geneva Convention Common Article 3, bars every act Hamas engaged in on that day, including violence to the life and person of anyone not engaged in combat, murder of all kinds, mutilation, cruel treatment and torture; the taking of hostages; and outrages upon personal

dignity, in particular the humiliating and degrading treatment of persons both living and dead, as these outrages continued even after many of those murdered were already lifeless.

64.    On October 7, hundreds of Israeli women were raped by Hamas fanatics; some were raped to death.  Israelis were incinerated, beheaded, tortured, and otherwise mutilated.

65.    Hamas spokesman Gazi Hamad subsequently announced that these actions by Hamas were the implementation of Hamas's political program, and that Hamas would repeat the events of October 7 "again and again" until Israel was destroyed.

https://www.youtube.com/watch?v=BJNccvNJtGk

66.    On October 11, 2023, just days after the horrific Hamas attack on Israel–indeed, before the incinerated Israeli bodies ceased smoldering–Hamas's actions were praised in an Instagram post put up by CCA's Critical Ethnic Studies program on its official CCA account. That post was emblazoned with a photograph of a pro-Palestinian march with Palestinian flags and a sign which read "DECOLONIZATION IS NOT A DINNER PARTY."  The post's narrative noted that the Critical Ethnic Studies Program "has a stellar record of teaching the historical and contemporary context of Israel's colonial legacy in Palestine." The message does not mention the brutal attack, rape and murders by Hamas, and instead defines Hamas's atrocities as "collective resistance." Also included on the post was, "You cannot use the term 'decolonize' without recognizing the toxicity and violence of settler colonialism. Decolonization is not a metaphor. Solidarity is not passive." A copy of that Instagram post is attached hereto as Exhibit F.

67.    This post was "liked" and therefore its message approved of by CCA's programs and administrators including the Dean of the Humanities and the Sciences, the Dean of Fine

Arts, the Senior Director of Faculty Affairs in the Provost's office, various academic

departments at the college, as well many faculty and several chairs, including but not limited to:

- Dave Beeman - Graduate Student Advisor
- CCA Critical Studies
- Wattis Art Institute
- Taraneh Hamami - professor in MFA program and Ethnic Studies
- Nasib Elahi - current MFA student
- Thomas Haakenson - former Associate Provost and Professor in History of Art
- the account of Alison "Sunny" Smith, Dean of Fine Arts, History of Art and Visual Culture Program
- Christof Steger - Chair of Animation
- Erik Scollon - Chair of First Year Program
- Lydia Nakashima - professor in Critical Studies and Critical Ethnic Studies, MFA Writing Program
- Tina Takemoto, Dean of Humanities and Sciences (at the time of the Instagram post, now recently assigned as Interim Director of Faculty Development and DEIB Academic Initiatives)
- Christine Wang, Professor of Painting and MFA
- Justin Hall - Chair of Comics
- Brian Karl: professor Critical Ethnic Studies
- Shy Pacheco Hamilton - personal account of CES chair, Design MBA program
- Em Meine -Senior Director, Faculty Affairs and Records, Academic Affairs Office
- Steve Jones, Professor of Design and Ethnic Studies.

68.     Through this Instagram post and its endorsement by CCA leadership, the

California College of the Arts effectively took the official position that Hamas's actions were

legitimate and that the mutilation, murder, and rape of Israelis on October 7 was the fault of the

Israelis who were raped and murdered; and that the act the Jews had committed that rendered

them at fault was their decision to live as Jews in the state of Israel.

69.     CCA's official position against the existence of the State of Israel as a Jewish

State is further codified by the post on the website of CCA's Ethnic Studies Department which

adopts verbatim the denunciations of Israel proclaimed by Israel's enemies.

70.     On October 10, 2023, Stephen Beal, CCA's president, issued a statement which

did not condemn any aspect of Hamas's actions but instead expressed concern about the feelings

of all members of the CCA community who may have been related to any persons killed or injured in Israel or Gaza on October 7.  See Exhibit E.

71.    On or about October 20, 2023, Dr. Fiss filed a complaint with the College regarding the CCA-CES DECOLONIZATION IS NOT A DINNER PARTY Instagram post and its ratification by many other CCA departments and leadership.  In her complaint, Dr. Fiss explained that "The content of the Instagram text appears to be a thinly veiled justification for the rape, torture, beheading and brutal murders of Jews in Israel by Hamas."  Dr. Fiss explained that "The message calls for 'collective resistance' without condemning terrorist acts that are clearly in violation of international law."  The Fiss complaint is attached hereto as Exhibit G.

72.    Maira Lazdins, CCA's Vice President of Human Resources, responded in an email dated November 28, 2023, to Dr. Fiss's complaint about the DECOLONIZATION IS NOT A DINNER PARTY post–over a month after Dr. Fiss filed her complaint. Lazdin informed Plaintiff that "free inquiry and expression are at the heart of every academic community," and therefore that the expression of support for Hamas's torture, rape and murder of hundreds of Jews, and the taking of hundreds more as hostages, was an exercise of academic freedom and would not be restrained in any way.  Plaintiff was admonished that the post's call for the murder of Jews had to be tolerated because CCA "continues to [focus] on modeling productive and respectful disagreement within our diverse community." CCA HR Response, attached hereto as Exhibit H.

73.    On December 21, 2023, more than two months after the offending Instagram message was posted, a CCA donor whose family had financially supported CCA for many decades had a post published in the *Times of Israel* media outlet, denouncing the Instagram post by CCA's Critical Ethnic Studies department which was supported by many other department

heads, members of administration, and faculty members declaring that "DECOLONIZATION IS NOT A DINNER PARTY." The donor recounted how CCA leadership gave him vague promises to investigate the circumstances but did not follow through. The donor had explained to the CCA President that the Instagram Post constituted vile antisemitism, glorifying the murder of Jews, and therefore also did harm to the institution. The donor also requested that a third party review the Critical Ethnic Studies program's curriculum, given that all students are required to take two courses in the program to graduate. The donor informed CCA that if it did not "change course," his family would revoke its bequest.  https://blogs.timesofisrael.com/college-stands-by-anti-semitic-instagram-post/

74.    The same day that the donor's op-ed appeared in print, CCA took down the post and asserted that it was commencing an investigation into the post. Dr. Fiss was contacted on that same day, December 21, 2022, by Maira Lazdins, CCA's VP for HR, with an "update" regarding the complaint Dr. Fiss had submitted regarding the DECOLONIZATION IS NOT A DINNER PARTY post. Six days later, and over ten weeks after she had filed her complaint about it, Dr. Fiss was informed that the investigation had been (re)commenced and that "[A]s a temporary, remedial measure" the post would be removed. See Exhibit I.  Dr. Fiss was asked to speak with a newly appointed outside investigator about the Instagram post.  On January 2, 2024, Dr. Fiss met with that investigator.

75.    On February 1, 2024, CCA wrote to Dr. Fiss, informing her that its investigation had concluded and that no CCA policies were violated by the October 11 Instagram post encouraging and applauding the rape, murder and mutilation of Jews in southern Israel.  CCA's investigation "did not find that the CES post violated any CCA policy (including but not limited to CCA's Sub-brand Policy and the policy prohibiting discrimination, unlawful harassment

retaliation), nor did it violate any applicable law, including federal, state and local laws prohibiting harassment and discrimination based on religion or ancestry." See Feb. 1, 2024 letter from Maira Lazdins to the Plaintiff, attached hereto as Exhibit J. CCA's previously issued position that CCA's October DECOLONIZATION IS NOT A DINNER PARTY Instagram Post was an exercise of "productive and respectful disagreement" on the advisability of the torture, mass murder and mass rape of Jews is one CCA continues to embrace.

76.     Once again, Dr. Fiss was told that her understanding of the DECOLONIZATION IS NOT A DINNER PARTY social media post and the pain and trauma it has caused her and other Jews is something she would have to bear because those who posted and liked the post were simply engaged in expressing their own protected views and that right outweighed any right to be protected from the harm inflicted by such speech.

77.     CCA leadership displayed the same indifference to reports of antisemitism when they were made by an emeritus professor, Barry M. Katz. On January 18, 2024, Katz had filed a complaint about the DECOLONIZATION IS NOT A DINNER PARTY post, explaining that because it "it fails even to acknowledge the events of October 7 it conveys an inescapable message: Jewish lives do not matter. For that reason, I formally charged the Chair of Critical and Ethnic Studies" (who had put up the post) "with racist antisemitism."

78.     In an open letter he issued after his complaint was dismissed, Katz explained further:

> I remain convinced that the Chair's use of the platform of an academic program to promote a private political agenda is inconsistent with CCA's policies which are designed to protect our community while safeguarding academic freedom and constitutionally protected speech. That a partisan political statement made in the name of an academic program was endorsed by professors, program chairs, deans, and senior administration officials up to and including the Office of Academic Affairs is shocking. It is hard to imagine how a member of CCA's Jewish community who is submitting coursework for a grade, requesting a letter of

recommendation, or applying for promotion or tenure could expect to be treated
with fairness, objectivity, and dignity.

Under these circumstances, I find it impossible to fulfill my academic
responsibilities, which include teaching, research, and college service. The
message posted on behalf of CES contributes to a hostile and politicized
environment in which I must choose whether to censor myself in the classroom
and the committee room or risk verbal and even physical abuse; I dare not discuss
my collaborations with scholars in other parts of the world; my professional
reputation has been damaged by my association with an institution in which such
actions appear not merely to be tolerated but widely endorsed.

See Exhibit K.

79.     For the crime of expressing his view that it is inappropriate for entire academic
departments of his college to approve of the murder of Jews, Katz was made the subject of a
complaint "that the Open Letter that you sent has caused [the complainants] to feel unsafe, suffer
from emotional distress and question how to complete their job duties in the hostile environment
that has been created."

80.     This Complaint was itself another form of harassment, making clear that, in the
eyes of the opponents of Jews like Katz, *any* expression of opinion in support of the Jewish
community at CCA is intolerable.

81.     CCA's disposition of the complaint against Katz was yet another display of the
different rules that apply to Jews, revealing that CCA's official position is indeed that Jews are
not permitted to criticize their attackers.  While public advocacy of the rape and murder of Jews
is an acceptable exercise of First Amendment rights and academic freedom, while the expression
of views like Katz's was deemed "unprofessional, uncollegial and inappropriate" because he
criticized the conduct of the person who had put up the pro-murder post.

82.     On November 3, 2023, Dr. Fiss – the only Jewish faculty member willing to
speak to CCA leadership on behalf of the Jewish students at CCA—wrote to CCA leadership to
advise that yet another student was victimized by the antisemitic environment at the school:

I would like to inform you that another graduate student has approached me about the difficulties he is having in his program and on campus. As a Jew, he says he feels he just has to "keep his mouth shut and stay under the radar." This is too bad, because he is a really bright and talented student.

You did not answer my last inquiry about another graduate student who approached me about a situation in one of our classes, where a female professor and the students in the class tried to coerce her to join the "pro-Palestinian" walk out.When she tried to offer her viewpoint, she said that she was completely "shut down." There was absolutely no room for discussion.

I am not going to encourage either of them to come forward, because I do not believe that there is a safe space, nor is anything really going to be done to better their circumstances.

Nothing has changed in the month since the brutal massacre by Hamas took place.

83.    Net result?  None of the students' concerns were substantively addressed.

**B.    PLAINTIFF EXPRESSED THOUGHTS TO A CCA STUDENT WITH WHICH THE STUDENT DID NOT AGREE AND CONVEYED INFORMATION THAT THE STUDENT DID NOT WANT TO HEAR**

84.    Upon information and belief, during the fall semester of 2023, CCA conferred upon an entity called Students for Justice in Palestine ("SJP") recognition as a student group entitled to privileges equivalent to every other recognized student group.

85.    On October 26, 2023, three members of the newly recognized student organization SJP staffed a table in the nave, in the "Nave" or main common atrium/hallway of the campus, although there were few people walking through the building at the time.  None of the students recognized Dr. Fiss or even knew she was a member of the CCA faculty, nor did Dr. Fiss know the identities of the people at the table.

86.    As Dr. Fiss traversed the CCA nave towards her office, one of these students called over Dr. Fiss to their table. Behind the table were pro-Palestine artwork and some QR codes.  The student who called her over requested that Dr. Fiss contact her government representatives to demand a ceasefire in Gaza—i.e., to demand that Israel cease its effort to

eradicate the terrorist organization, Hamas. There was nothing in the public display that identified the students at the table as either CCA students or as CCA students who were members or supporters of SJP. Indeed, Plaintiff was unaware that SJP had recently been officially recognized as a student group at CCA.

87.     Dr. Fiss saw that the people at the table had hung up a handmade poster that called for the "liberation of Palestine" "From the River to the Sea." Dr. Fiss was troubled by the display, as her understanding of the "River to the Sea" phrase is associated with the Palestinian nationalist movement, advocating for a free and independent Palestine from the Jordan River to the Mediterranean Sea, which encompasses the entirety of historic Palestine, including what is now Israel. Dr. Fiss's interpretation of the phrase was supported by a map of Israel with the colors of the Palestinian flag over the entire country and that map was part of the display behind the SJP students' table. See Exhibit L. Plaintiff took a photo of the students in front of this sign because it was concerning to her and she wanted to understand whether such displays in any way violated CCA policy.

88.     Dr. Fiss asked the students if she could take a photograph of their display and they said yes. When Dr. Fiss took the photograph, the students were smiling and seemed proud and happy that Dr. Fiss was taking a picture of them with their artwork and paraphernalia.

89.     The students did not object in any way to Dr. Fiss taking this photograph. Indeed, Plaintiff had a clear right to take the photograph under California law because when Plaintiff took the photograph, the SJP members were at that table precisely because it was in public, and they therefore had no expectation of privacy. At no time during their interaction—even after Dr. Fiss intimated that she was not wholly in agreement with the SJP members about the issues they were discussing—did those students inform or in any way indicate to Plaintiff that they had

revoked her consent to being photographed by Plaintiff, nor did they ask Plaintiff to delete the photograph. In fact, their demeanor suggested a level of comfort and approval with her photographing them.

90.     Dr. Fiss asked one of the women staffing the table what they meant by the slogan "From the river to the sea, Palestine will be free." Rather than answer her, this woman turned around and ripped the poster down. That woman then said to Dr. Fiss, "Now will you call your elected representatives?"

91.     Next, that student told Dr. Fiss that Hamas didn't have real weapons to commit the crimes they were accused of committing after they broke through the barrier into Israel on October 7. The student made this claim despite the plethora of videos taken by the Hamas terrorists themselves committing those crimes. The student further informed Dr. Fiss that even within Gaza, Hamas had no weapons and that the only missiles Hamas had were unexploded Israeli ordnance.

92.     Dr. Fiss asked the students where they got their news from, and what sources were they reading? At this point, another of the students, later identified by a CCA Human Resources official as Maryiam Alwael, explained she was from the Middle East and therefore knew the real story there.  When Dr. Fiss asked that student where in the Middle East she was from, the student said Kuwait. Dr. Fiss then brought up the challenges Palestinians faced in Kuwait, citing the deportation of over 300,000 Palestinians from Kuwait in 1991. Alwael responded by expressing confusion, claiming she had no knowledge of the events mentioned by Dr. Fiss and attributing it to a potential language barrier or misunderstanding.

93.     Dr. Fiss highlighted the nuanced perspectives among Middle Eastern students at CCA regarding Hamas and Iran's support. She underscored her commitment to intellectual

diversity, explaining her deliberate consumption of varied news sources and academic viewpoints to guard against the echo chamber effect perpetuated by social media. Thus Dr. Fiss told those sitting at the table that she wasn't sure that all students from the Middle East would necessarily agree with their views on Hamas, noting that she knew several Middle Eastern students at CCA, for example, who opposed Hamas and Iran's support for the terrorist group. Dr. Fiss then told the students that she herself tries to read news and academic articles from a wide range of political viewpoints to ensure that she doesn't end up in an echo-chamber as is so prevalent with the influence of social media.

94.     Alwael responded with a confident smile and said that she "liked her echo chamber." It was clear then to Dr. Fiss that there was no reason to continue the conversation. Dr. Fiss walked away.

95.     At no time during this discussion did Dr. Fiss raise her voice, violate the personal space of any of the people staffing the table, threaten them or anyone else with violence, with a poor academic grade, or anything else (or even identify herself as a faculty member) nor did Plaintiff denounce their views, or insult them.

96.     Throughout the entirety of the conversation detailed above, Dr. Fiss exhibited a commendable level of professionalism and adherence to legal and ethical standards. At no point did she engage in behavior that could be construed as coercive or threatening. Dr. Fiss maintained a respectful distance from the individuals present and refrained from any form of verbal or physical aggression. Importantly, she did not exploit her position as a faculty member to intimidate or influence the discussion. Furthermore, Dr. Fiss demonstrated a commitment to academic freedom by engaging in a civil exchange of ideas, without denouncing or insulting the viewpoints of the individuals involved.

C.    **PLAINTIFF IS DISCIPLINED FOR HER COMPLETELY INNOCENT AND ENTIRELY PROFESSIONAL INTERACTION WITH A STUDENT**

97.    On November 16, 2023, Plaintiff was informed by Suzanne Guevarra, CCA's Director of Human Resources, that a complaint had been filed against her.  Dr. Fiss was not told who had filed the complaint against her, or what the complaint was about, nor was she provided with a copy of the complaint.

98.    Guevarra sent Dr. Fiss an email which stated, "I am reaching out to you with regards to a recent complaint," and only indicated that Dr. Fiss was accused of having had a "harassing and discriminatory interaction" with a student. See Nov. 16, 2023, email from Guevarra to Fiss, attached hereto as Exhibit M.

99.    The student who claimed Plaintiff had harassed and discriminated against her, Dr. Fiss later learned, was the SJP person at the table, Maryiam Alwael, the one who claimed she was from Kuwait but who denied Kuwait's expulsion of 300,000 Palestinian Arabs during the Gulf War.

100.    The only other CCA professor who publicly identified as being Jewish and supporting the right of Israel to exist also had a complaint filed against her by CCA SJP students just one day later, November 17.

101.    On that day the SJP and its followers held a protest against Israel which blocked the entrance to the campus. That other Jewish professor had to get through the crowd in order to get to a class she teaches.  No words were exchanged between that professor and the students blocking the entrance to CCA.  But the student who lodged the complaint against the other Jewish professor wrote in that complaint that the professor "stepped over a group of peaceful students respectfully mourning the names of Palestinians murdered by the State of Israel." The

complaint stated that the professor's passage "felt disrespectful." That Jewish professor was informed of the complaint by CCA'S Human Resources department on November 27, 2023.

102.    At no time was Dr. Fiss provided a copy of the complaint filed against her. Instead, the substance of the complaint was described to Plaintiff orally by CCA's Director of Human Resources Suzanne Guevarra, when Dr. Fiss was "interviewed" about the complaint over Zoom on November 20, 2023.

103.    On December 12, 2023, Plaintiff was informed that the complainant and witnesses in support of the complaint had been interviewed by Guevarra. The only witnesses were the two other students at the SJP table.

104.    Plaintiff was not present when those interviews took place and had no opportunity to hear her accusers or to cross-examine any of the people who testified regarding Dr. Fiss's conduct or any other aspect of the incident.

105.    When Dr. Fiss was informed that a complaint had been filed against her, she was also informed that the investigation into the complaint would extend to any witnesses Plaintiff identified. Plaintiff identified such a witness –Tricia Brand, who is the CCA Vice President for Diversity, Equity, Inclusion and Belonging.

106.    Dr. Fiss had, by happenstance, encountered Brand immediately after the interaction between Fiss and the SJP students, and Dr. Fiss had recounted to Brand what had occurred. After Brand was interviewed by the Human Resources department, Brand informed Dr. Fiss during a conversation that she couldn't believe HR was investigating her, and that Brand told the investigator that, when Brand and Dr. Fiss spoke immediately after the interaction between her and the Complainants, Dr. Fiss was not aggravated in any way, was completely

reasonable in her account of the brief interaction, and that Dr. Fiss had informed Brand at that time of the use of the slogan "From the River to the Sea" at the table.

107.    Brand further informed Dr. Fiss that students had also painted an unauthorized mural with the same slogan ("From the River to the Sea"); that Brand disapproved of the mural and that campus facilities had been instructed to paint it over.

108.    It is Plaintiff's understanding, based on the adjudication against her, that the complaint asserted that Dr. Fiss had violated three provisions of the CCA handbook:

    a.    4.C. Prohibition of Unlawful Harassment,

    b.    E.4. Dismissal or Discipline for Adequate Cause Relating to Misconduct and

    c.    Appendix B: AAUP Statement on Professional Ethics

109.    Dr. Fiss was informed on December 12, 2023 that she was found to have violated CCA policy 4.C. Prohibition of Unlawful Harassment, 2.E.4. Dismissal or Discipline for Adequate Cause Relating to Misconduct and Appendix B: AAUP Statement on Professional Ethics.

110.    Among Dr. Fiss's alleged offenses was the fact that when she learned one of the women with whom she was speaking was from Kuwait, "you began explaining the history of Alwael's country to her." This is clearly a reference to the fact that Dr. Fiss had identified facts which the student did not know or acknowledge— exactly the activity which is normally considered to be the job of a college professor. The CCA decision also found that "The nature and tone of the statements by you caused the students to reasonably believe that you were using your positional power as a Professor to get the outcome you sought, which was for the students to agree with your point of view." This finding was made in spite of the fact that during the interaction in the school hallway on October 26, 2023, the students did not know who Dr. Fiss

was and did not know that she was a CCA professor. See December 12, 2023, letter to Dr. Fiss, attached hereto as Exhibit N.

111.    As a result of the decision, CCA imposed the following sanctions upon Plaintiff:

a.    You must immediately cease this and similar behavior with any student or employee of the college and if you continue to do so again, you will remain subject to further disciplinary action that could result in discharge for cause.

b.    When you were taking photos of Maryiam, she consented because she thought you were from Student Life. When she realized this was not the case, she felt threatened by your actions and became concerned about what you were going to do with these photos. You must immediately delete any photos you took of her and any other students who were a part of this interaction.

c.    You must take the mandatory Supporting Diversity, Equity, Inclusion and Belonging (Ranked Faculty Required Training) as well as retake the Preventing Harassment & Discrimination - Non-Supervisor Training (both are in Workday) no later than December 31, 2023.

d.    You must confirm your review of the attached policies by signature that pertain to anti-harassment and discrimination provided to you by Human Resources. As with any complaint process, please do not contact the students involved in this matter.

112.    Dr. Fiss informed Suzanne Guevarra that she did not agree with the results of the investigation, and she asked what the procedure was for appeal. Dr. Fiss was informed by CCA that there is no appeal process. See Exhibit O.

### D.    CCA'S DISCRIMINATORY APPLICATION OF DISCIPLINARY PROCESS

113.    The contrast could not possibly be starker between the treatment of Dr. Fiss's factual statement to students in CCA's hallway, on the one hand, with the explicit calls for rape and murder published by CCA itself and ratified by its administration.  And the hard evidence available in Dr. Fiss's complaint about the DECOLONIZATION IS NOT A DINNER PARTY CCA Instagram post, which consisted of the post itself, something publicly available and accessible for all to see with no issues of credibility or reliability as to its content, in contrast to the hearsay, repeated by all three students with the same ideological viewpoint and commitment and therefore hostility to Plaintiff's own viewpoint and understanding, which CCA treated as independent corroboration of the harassment complaint leveled against Dr. Fiss by Maryam Alweal. In contrast, the allegations against Dr. Fiss rely solely on hearsay from three students who share the same ideological stance and exhibit clear hostility towards her perspective. Despite this, CCA treated these hearsay accounts as independent corroboration of the harassment complaint filed by Maryiam Alweal.

114.    Such treatment deviates significantly from principles of fairness and impartiality.  The identical testimonies from the two additional students, who shared the same ideological bias, were improperly considered independent and impartial. In any investigation aspiring to genuine impartiality and fairness, the identical testimony of the three SJP students should not be regarded as tipping the balance of credibility. CCA's acceptance of these three students' identical accounts as credible evidence undermines the integrity of the investigative process. Elevating the value of their testimonies solely based on their quantity, despite their shared ideological predisposition, compromises the essence of a fair-minded inquiry.

115.    This approach by CCA distorts the balance of credibility and reflects a profound institutional bias, effectively silencing dissenting viewpoints under the pretense of objectivity. Such conduct raises serious questions about the impartiality and fairness of the investigation, as well as the institution's commitment to upholding the principles of academic freedom and unbiased adjudication.

116.    The testimony of CCA DEIB director Tricia Brand should have been given at least equal weight as she was impartial and if anything, as a member of CCA's administration, would be expected to be unswayed by partiality. And yet Brand's input was not even mentioned in the decision finding Dr. Fiss to have violated school policies.

117.    CCA officially praised the Instagram post DECOLONIZATION IS NOT A DINNER PARTY statement as an exercise in academic freedom, both initially—in response to Dr. Fiss's complaint about it—and ultimately—when, months after it was posted, an outside consultant was brought in belatedly to conduct an investigation about the Instagram post.  CCA rejected any claim that the post was improper because it "continues to [focus] on modeling productive and respectful disagreement within our diverse community."

118.    Thus, CCA's position is that Dr. Fiss and all Jews at CCA must engage in productive and respectful disagreement about whether murdering all of the Jews in Israel—i.e., half of the world's Jewish population—is or is not a good idea.

119.    An environment in which a Jew must engage in respectful disagreement about whether it is a legitimate form of expression to call for and to justify the brutal murder of Jews is an environment hostile to Jews.

120.    Dr. Fiss's entirely factual statement to a student about the lives of Palestinians in Kuwait, by contrast, was censured by CCA, as was her encouragement to students to seek

information from sources with which they might not agree. The students' rejection of that advice – "I like my echo chamber" – reflects exactly the state of mind that college is supposed to cure, and that it is the job of a college professor to address. It is the very essence of academic freedom for a professor to encourage students to learn things they don't already know.

121.    Dr. Fiss was punished for doing her job simply and only because Dr. Fiss is a Jew committed to the existence of the State of Israel as a Jewish State.

122.    The result of this distorted process, of CCA's indifference to the plight of the Jews on its campus, and CCA's willingness to sanction even a tenured Jewish academic on the strength of baseless accusations, is that Dr. Fiss has been left fearful that any step she takes relating in any way to Israel, the Middle East, or a Muslim student will be the basis for further discipline, a finding of wrongdoing, and punishment, including dismissal.

123.    This fear has been conveyed to the CCA leadership, which has resolutely refused to do anything about it—even to provide guidance so that conflicts between Dr. Fiss and others can be avoided.

124.    One example of this problem is the series of interactions Dr. Fiss has had with a Muslim student in her class who has, in the wake of the finding of wrongdoing against Dr. Fiss, repeatedly insisted that Dr. Fiss give a high grade to classwork which ignored the assignment and instead simply repeated Muslim claims regarding its right to the Temple Mount, upon which is also located the Al-Aqsa Mosque, using religious websites as her source material.

125.    This student, who repeatedly sat through entire sessions of Dr. Fiss's class with her cellphone at her ear–despite announcements being made repeatedly that no cellular devices were permitted during class–also repeatedly informed Dr. Fiss that she "expects an A" in Dr. Fiss's class.

126.    Dr. Fiss repeatedly asked CCA for advice on how to deal with this student so that a conflict can be avoided, and so that Dr. Fiss is not, again, charged with a disciplinary offense on the basis of her interaction with a student who appeared hostile.

127.    All such requests for assistance were rebuffed.

128.    Dr. Fiss asked that, in light of the fact that this student wanted to focus again on Al-Aqsa for her final project, that another faculty member be assigned to work alongside Dr. Fiss in guiding the student through the required stages of research and writing, preferably with someone who was more familiar than Dr. Fiss with Islamic art and architecture.  This request was also denied.

129.    The result of these refusals to assist, combined with the existing record created by CCA against Dr. Fiss, and the student's intentional demand for approval of her religious views as adequate academic work (regardless of the actual academic quality of the work) have left Dr. Fiss unable to determine how to do her job in a manner that simultaneously

    a.    upholds Dr. Fiss's academic standards and

    b.    enables Dr. Fiss to avoid being sanctioned again.

130.    CCA has refused to assist Dr. Fiss in achieving both of these goals, leaving Dr. Fiss with the clear understanding that CCA is unwilling to have Dr. Fiss achieve both of these goals.

131.    On March 13, 2024, Dr. Fiss obtained a Right to Sue letter from the U.S. Equal Employment Opportunity Commission, which is attached hereto as Exhibit P.

132.    Defendant CCA receives financial assistance from the U.S. Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

133.    Discrimination against Jews is prohibited under Title VI of the Civil Rights Act of

1964, as reflected in the written policies of the Department of Education's Office for Civil

Rights. See e.g., U.S. Dep't of Educ., OCR Dear Colleague Letter:

> Addressing Discrimination Against Jewish Students (May 25, 2023),
> https://www2.ed.gov/about/offices/list/ocr/docs/antisemitismdcl. pdf; U.S. Dep't
> of Educ., OCR-000127, Questions and Answers on Executive Order 13,899 (Jan.
> 19, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-anti-
> semitism- 20210119.pdf; U.S. Dep't of Educ., OCR-00107, Dear Colleague
> Letter: Combatting Discrimination Against Jewish Students (2017),
> https://www2.ed.gov/about/offices/list/ocr/docs/jewish-factsheet-201701.pdf;
> Letter from Thomas Perez, Asst. Att. Gen., Civ. Rts. Div., U.S. Dep't of Justice to
> Russlyn Ali, Asst. Sec'y for Civ. Rts., OCR, U.S. Dep't of Educ. Re: Title VI and
> Coverage of Religiously Identifiable Groups (Sept. 8, 2010),
> https://www.justice.gov/sites/default/files/crt/legacy/2011/05/04/090810 AAG
> Perez Letter to Ed OCR Title%20VI and Religiously Identifiable Groups.pdf;
> U.S. Dep't of Educ., OCR Dear Colleague Letter: Religious Discrimination (Sept.
> 23, 2004), https://www2.ed.gov/about/offices/list/ocr/religious-rights2004.html.

134.    On November 7, 2023, OCR had issued a new Dear Colleague Letter, reminding

schools that receive federal financial assistance that they have a

> responsibility to address discrimination against Jewish, Muslim, Sikh, Hindu,
> Christian, and Buddhist students, or those of another religious group, when the
> discrimination involves racial, ethnic, or ancestral slurs or stereotypes; when the
> discrimination is based on a student's skin color, physical features, or style of
> dress that reflects both ethnic and religious traditions; and when the
> discrimination is based on where a student came from or is perceived to have
> come from…
>
> Harassing conduct can be verbal or physical and need not be directed at a
> particular individual.

U.S. Dep't of Educ., OCR Dear Colleague Letter: Shared Ancestry or Ethnic

Characteristics (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-

202311-discrimination-harassment-shared-ancestry.pdf.

135.    OCR further explains that "the following type of harassment creates a hostile

environment: unwelcome conduct based on shared ancestry or ethnic characteristics that, based

on the totality of circumstances, is subjectively and objectively offensive and is so severe or

pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* And it repeats its longstanding admonition that "[s]chools must take immediate and effective action to respond to harassment that creates a hostile environment." *Id.*

136.   Defendant's discriminatory application of its nondiscrimination policy and willful failure to enforce its nondiscrimination policy discriminates against Jews by: giving formal recognition to the discriminatory SJP student group; using a kangaroo court-star chamber proceeding to support the gaslighting efforts of student members of SJP who were frustrated by Plaintiff's refusal to comply with their demand that she contact her government representatives to demand a ceasefire in Gaza, by "finding" Plaintiff guilty of "harassing" the students who in fact had harassed her.

137.   All of the CCA actions at issue in this case are related to one another because all are driven by, and applications of, CCA's policy of enforcing hostility to Plaintiff's ethnic, ancestral and religious commitments.  All of these acts are therefore intentional acts of discrimination by CCA against Plaintiff on the basis of her ethnicity, ancestry and religion.  They manifest CCA's deliberate indifference to the impact on Plaintiff of CCA's enforcement of its official policy mandating hostility to Israel and Zionism.

138.   Defendants' discriminatory application of its policy and failure to enforce its nondiscrimination policy has created an environment that is hostile towards Jews and Zionists, including Jewish faculty members such as Plaintiff.

139.   The hostility towards Jewish and Zionist members of the CCA community is severe enough that it interferes with Plaintiff's ability to participate in the programs and activities of the school. As a result of this hostility, the CCA campus has become a hostile environment

and Plaintiff's presence on campus a source of continuing tension and pain to her.  This has dramatically affected, and harmed, Plaintiff's ability to work, her ability to enjoy her work, the way she works and it has even changed where she works, driving Plaintiff to do as much of her scholarship off campus as possible.

140.    As described in the allegations above, Plaintiff cannot function as a scholar and cannot participate in the intellectual life of CCA campus because in asking informed questions, let alone expressing her opinions, she runs the risk of retaliatory targeting. Because CCA has already installed one "strike" against Plaintiff in her personnel file with its unfounded determination that she harassed a student, Plaintiff is chilled in her ability to teach, to speak to students and to speak to colleagues because she is always conscious that any manifestation of a view contrary to CCA's imposed orthodoxy will result in another accusation of harassment and then her termination as a result of another proceeding as biased and unfounded as the one that CCA has already conducted against her.

E.    **THE FLOODING OF CCA WITH MATERIALS WHICH ADVOCATE FOR THE DESTRUCTION OF ISRAEL AND JUSTIFY THE RAPE AND MURDER OF ISRAEL'S JEWISH CITIZENS, MAKES THE CAMPUS IN WHICH SUCH MATERIAL IS USED A HOSTILE ENVIRONMENT FOR PLAINTIFF AND OTHER JEWS**

141.    When Jews are attacked anywhere in the world because they are Jews, Jews around the world experience that attack as an attack, or a threat to, them personally.  When such an attack on Jews is claimed to be a moral act on the ground that the victims are Jews living in the Jewish homeland – as if that were a justification for the attack -- that attack is experienced by Jews around the world as an attack on, and a threat to, them and their identity.

142.    Repeating this justification for attacks on Jews constitutes harassment of Jews as Jews, and therefore harassment of Jews on the basis of their religion, and their ethnic ancestry.  It also constitutes harassment of Israelis on the basis of their nationality.

143.    The flooding of CCA with posts, signs and official departmental statements which make these assertions creates a hostile environment for Jews, which denies Jews the ability to work on an equal basis with others.

144.    This is so because Identity-based stress or trauma stems from direct or indirect behavior or messaging that communicates hatred, vitriol, delegitimization, disaffirmation, or dehumanization towards individuals who share a social identity or have shared ancestry. Bias, microaggression, or discrimination aimed at individuals within a group causes exponentialized identity-based stress to that group (Stevenson, H. C. (2014). *Promoting Racial Literacy in Schools: Differences that Make a Difference.* Teachers College Press).

145.    Vicarious identity-based trauma affects people within a marginalized or vilified social identity group who see others in their group being singled out, mistreated, punished, or subjected to stressful identity-based encounters.  This can engender a sense of helplessness to intervene given asymmetrical power relations. When symbolic violence occurs or is depicted, or advocated for in classrooms or schools, it can traumatize people within the same group as those against whom such symbolic violence occurs or is depicted, when such people are unable to respond to their own or someone else's benefit during discriminatory acts or mistreatment (Stevenson, H. C. (2014). *Promoting Racial Literacy in Schools: Differences that Make a Difference.* Teachers College Press).

146.    Structural conditions in campuses that exacerbate identity-based trauma include ignoring identity-based trauma happening to members of such an academic community by not

attending to bias, microaggressions, or discrimination (Yip, T., Cham, H., Wang, Y., & Xie, M. (2022).

147.    This constitutes vicarious identity-based trauma as Jews see systems fail them and other Jews, and see whistle blowers and victims of antisemitism being pathologized, mistreated, misjudged, or blamed for trying to address their own or others' identity-based trauma. Victim blaming is a form of identity-based trauma and antisemitism.  (Berman S. L, Montgomery M. J., Ratner K. (2020). Trauma and identity: A reciprocal relationship? *Journal of Adolesc.* Feb;79:275-278. doi: 10.1016/j.adolescence.2020.01.018. Epub 2020 Feb 6. PMID: 32036171.

148.    "A sense of belonging—the subjective feeling of deep connection with social groups, physical places, and individual and collective experiences—is a fundamental human  need that predicts numerous mental, physical, social, economic, and behavioral outcomes….There is general agreement that belonging is a fundamental human need that all people seek to satisfy (Baumeister, R. F., & Leary, M. R. (1995), *The need to belong: Desire for interpersonal attachments as a fundamental human motivation*, *Psychological Bulletin, 117*(3), 497–529. https://doi.org/10.1037/0033-2909.117.3.497 ; Ryan, R. M., & Deci, E. L. (2000). Self-determination theory and the facilitation of intrinsic motivation, social development, and well- being. *American Psychologist, 55*(1), 68–78. https://doi.org/10.1037/0003-066X.55.1.68; Leary, M. R., & Kelly, K. M. (2009). Belonging motivation. In M. R. Leary & R. H. Hoyle (Eds.), *Handbook of individual differences in social behavior* (pp. 400–409). The Guilford Press. "Other studies have examined the benefits that arise from a sense of belonging. Studies have identified numerous positive effects of having a healthy sense of belonging, including more positive social relationships, academic achievement, occupational success, and better physical and mental health (e.g., Allen, K. A., Kern, M. L., Rozek, C. S., McInereney, D., & Slavich, G. M. (2021).

Belonging: A Review of Conceptual Issues, an Integrative Framework, and Directions for Future Research. *Australian journal of psychology*, *73*(1), 87–102, https://doi.org/10.1080/00049530.2021.1883409). A lack of belonging is linked to an increased risk for mental and physical health problems.  Research shows that persistent stress and identity- based trauma leads to a lack of a sense of belonging, which also has deleterious effects on academic performance, social engagement, and sense of belonging as members of an academic community.

149.    A traumatizing environment is a hostile environment, always. A hostile or traumatizing environment/academic culture is one in which members of such a community feel disaffirmed or blamed for mistreatment aimed at them based on their social identity group or where they are held to a double standard of what constitutes a protection-worthy social identity. In these conditions, persons in a targeted identity group such as Jews at CCA are treated with essentializing and deficitizing behaviors based on unchecked (and in some cases unconscious) bias, which discriminates against Jews based on assumptions about their Jewish shared ancestry, belief in Israel, Judaism, or Zionism (Bacha, C., Einhorn, S., & Lieberman, S. (2021). 'If you prick me, do I not bleed?': Antisemitism, racism and group analysis —some thoughts. Group Analysis, 54(3), 388-401. https://doi.org/10.1177/0533316421996111; Berman S. L, Montgomery M. J., Ratner K. (2020). Trauma and identity: A reciprocal relationship? *Journal of Adolesc.* Feb;79:275-278. doi: 10.1016/j.adolescence.2020.01.018. Epub 2020 Feb 6. PMID: 32036171).

150.    For Jews post-October 7th, antisemitism has become the cudgel of identity-based trauma at the hands of peers and justified by leaders given their own unconscious antisemitism— a perception of Jewish people expressed as hatred, vitriol, delegitimization, or dehumanization

that uses tropes of conspiracy and control to justify demonizing, stereotyping, degrading, or harming Jews individually or collectively (Bacha, et al., 2021).

151.    A hostile academic environment negates Jews' sense of psychological safety in who they are and in experiencing 'unconditional positive regard' (Maslow, A. H. (1943). A Theory of Human Motivation. *Psychological Review*, 50, 370-396.

http://dx.doi.org/10.1037/h0054346), and in their identity, which includes the centrality of their ancestral homeland, Israel. This unchecked cultural and religious bias/violation constitutes a traumatizing academic environment and culture for Jews that impacts their ability to feel safe enough to work; it harms their sense of identity, both on campus and in the world. These institutional conditions create a hostile academic environment for Jews who are treated as "colonizers" even as they are clearly being actively marginalized (Berman, et al., 2020).

152.    The materials posted and omnipresent at CCA, and at issue here, convey exactly these claims about, and attacks on, Jews living in the State of Israel. They therefore create an academic environment that is hostile to Jews and Israelis on the campus in which they are used.

**Count I**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**Hostile Work Environment**
**And**
**Disparate Treatment**

153.    Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

154.    Plaintiff Fiss suffered intentional discrimination because of her religion and ethnic origin. The discrimination was both severe and pervasive.

155.    Defendant's discriminatory behavior included, but was not limited to, the following:

a.    Persecuting Defendant via a kangaroo court-star chamber proceeding for having the temerity to object to an SJP chapter's advocating the destruction of Israel by calling for the "liberation" of Palestine "From the River to the Sea"; finding her guilty of "harassing" students and of purportedly causing the students to believe that Plaintiff used her positional power as a Professor to get the outcome she sought, which was for the students to agree with her point of view; and subjecting her to disciplinary action for what was in effect gaslighting by students frustrated by Plaintiff's refusal to comply with their demand that she contact her government representatives to demand a ceasefire in Gaza. The proceeding itself lacked the most basic due process protections, including allowing Plaintiff to see the charges against her, or to confront her accusers.

b.    Maintaining a hostile environment by allowing and contributing to a vast disparity in university responses to news events, specifically:

i.    Discriminatory college responses to news events in publicly condemning violence against blacks, gender violence in Iran, anti-Muslim violence in New Zealand and elsewhere, but consistently refusing to condemn violence against Jews and Israelis including the 2018 mass murder in Pittsburgh, the 2019 attack in Poway, and the October 7, 2023, murder, rape, torture, decapitation, mutilation, and kidnapping of civilians in Israel.

ii.   Although it refused to condemn the brutal October massacre of Israelis and Jews, Defendant CCA, by its leadership and faculty, *endorsed* the massacre. Specifically, on October 11, 2023, the college's Critical Ethnic

Studies Program posted to its official Instagram account that
"Decolonization is Not a Dinner Party." It further stated, "decolonization
is not a metaphor," expressed solidarity with Palestine, asserted that it
teaches students about "Israel's colonial legacy in Palestine," and called
for collective resistance. The Deans of H&S, Dean of Fine Arts, Senior
Director for Faculty Affairs, various academic departments at the college,
several department chairs, and many faculty members "liked" the post,
thereby approving of its message.

   c.        Forcing Plaintiff to retake several mandatory Supporting Diversity, Equity,
Inclusion and Belonging training.

156.    In addition to the discriminatory actions specifically targeting Plaintiff, CCA
tolerated or fostered discriminatory actions that contributed to creating a pervasive atmosphere of
discrimination targeting Jews and Zionists.

157.    Defendant treated Plaintiff differently from, and worse than, the way it treated
others who do not share Plaintiff's ancestral, ethnic and religious commitments.

158.    The discrimination has detrimentally affected Plaintiff.

159.    The discrimination would detrimentally affect a reasonable non-Jew and non-
Zionist in her position.

160.    Defendant CCA had actual or constructive notice of the hostile environment
against Dr. Fiss on the basis of religion and ethnic origin in that Dr. Fiss repeatedly brought these
issues to the attention of CCA leadership until, finally, she realized that nothing she said or did
would induce that leadership to correct the hostile environment.

161.    Defendant CCA did not have an adequate or effective procedure for handling hostile environment complaints.

162.    Defendant CCA knew or should have known of the hostile environment and failed to stop it.

163.    Defendant CCA negligently failed to discipline or take prompt and adequate remedial action.

164.    Defendant CCA violated Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991.

165.    As a result of ethnic and religious harassment by CCA, Plaintiff has suffered and will continue to suffer damages.

166.    Defendant CCA engaged in these discriminatory practices with malice or with reckless indifference to Plaintiff's federally protected rights.

**Count II**
**Title VI of the Civil Rights Act of 1964**
**U.S.C. 2000*d et seq.***

167.    Plaintiff repeats and reallege the allegations of the preceding paragraphs as though fully stated herein.

168.    CCA's budget is derived largely from tuition.  According to its 2023 Form 990, of CCA's total revenue of $107,178,646, the overwhelming share, $80,476,155, consisted of tuition and fees. Total salary and wage expense was $37,003,790, which means that tuition is necessarily used to pay salaries. Because tuition and fee revenue constitutes approximately 80% of total revenue, it is most reasonable to infer that tuition and fees constitute 80% of the funds used to pay salaries.

169. CCA receives funds from the United States Department of Education pursuant to Title VI of the Civil Rights Act of 1964, and those funds come largely if not entirely in the form of tuition subsidies and student loans which are used to pay tuition and fees. The primary objective of the federal funds that CCA receives is the payment of salaries for employment, including the employment of all of the people involved in committing the harassment at issue in this case.

170. For these reasons, CCA is subject to suit under Title VI.

171. Discrimination against Jews and/or Israelis—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin, including the shared commitment to Israel—is prohibited under Title VI, as reflected not only in decades of Title VI jurisprudence, but also in the written policies of the Office of Civil Rights of the United States Department of Education.

172. Dr. Fiss is and identifies as Jewish, and her status and identification as a Jew committed to Israel brings her within the scope of Title VI's protections.

173. Title VI prohibits a recipient of federal funds from intentionally treating any individual worse, even in part, because of his or her ancestry, race, ethnic characteristics, or national origin.

174. The acts and omissions of CCA and its administrators subjected, and continue to subject, Dr. Fiss to discrimination and harassment on the basis of her actual and/or perceived Jewish ancestry, race, ethnic characteristics, or national origin.

175. CCA and its administrators had actual notice that such discrimination and harassment, over which CCA has substantial control and the authority to remediate, was and continues to be so severe, pervasive, and objectively offensive that it created and continues to create a hostile environment based on Jewish ancestry, race, ethnic characteristics, or national

origin which discriminates against Dr. Fiss on the basis of her Jewish ancestry, race, ethnic characteristics or national origin.

176.    CCA and its administrators intentionally discriminate against Dr. Fiss on the basis of her actual and/or perceived Jewish ancestry, race, ethnic characteristics, or national origin, as exhibited by CCA's and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of Dr. Fiss, in violation of Title VI. Specifically, CCA and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Dr. Fiss and the hostile environment that she is forced to endure at CCA because of her race, ethnic characteristics, or national origin. Additionally, CCA continues to grossly fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring. Such unlawful deliberate indifference causes Dr. Fiss to be subjected to a hostile educational environment.

177.    The environment at CCA, which has been rendered hostile for Dr. Fiss as a result of her Jewish ancestry, race, ethnic characteristics, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that CCA discriminates against Dr. Fiss, imposing working conditions on her employment that CCA does not impose on non-Jewish faculty.

178.    CCA and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

179.    CCA and its administrators also directly and intentionally discriminate against Dr. Fiss, with her actual or perceived Jewish ancestry, race, ethnic characteristics, or national origin a substantial or motivating factor in CCA's actions.

180.    CCA continues to unreasonably fail to act, or to act grossly inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay,

in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish and/or Israeli student or faculty member, including Dr Fiss. As detailed above, CCA's actions, inactions, and conduct were, and continue to be, intended to treat Dr. Fiss differently as a Jewish faculty member as compared to other similarly situated non-Jewish and/or non-Israeli faculty.

181.    CCA's violations of Title VI are the actual, direct, and proximate causes of Dr. Fiss's injuries.

182.    As a result of the foregoing, Dr. Fiss has suffered, and continues to suffer, substantial damages, in amounts to be determined at trial.

183.    Dr. Fiss has been and will continue to be injured because CCA has and will continue to intentionally discriminate against her on the basis of Jewish ancestry, race, ethnic characteristics, or national origin.

184.    Plaintiff is entitled to appropriate injunctive relief under Title VI, because CCA has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate or speedy remedy at law to prevent CCA from continuing to discriminate against Dr. Fiss on the basis of Jewish ancestry, race, ethnic characteristics, or national origin in violation of Title VI; and the harm Dr. Fiss will otherwise continue to suffer is irreparable.

185.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**Count III**
**Cal. Gov't Code § 12920, Cal. Labor Code**

186.    Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

187.    California civil rights law prohibits workplace discrimination and harassment on

the basis of religion, race, national origin, and ancestry.

188.    Plaintiff has suffered discrimination and hostile environment, as described above.

189.    The discrimination has detrimentally affected Plaintiff.

190.    The discrimination would detrimentally affect a reasonable non-Jew and non-Zionist in her position.

191.    Defendant CCA had actual or constructive notice of the hostile environment against Plaintiff on the basis of religion and ethnic origin.

192.    Defendant CCA did not have an adequate or effective procedure for handling hostile environment Complaints.

193.    Defendant CCA knew or should have known of the hostile environment and failed to stop it.

194.    Defendant CCA negligently failed to discipline or take prompt and adequate remedial action.

195.    Defendant CCA violated California Government Code § 12920 and the California Labor Code.

196.    As a result of harassment by CCA on the basis of Plaintiff's religion, race, national origin, and/or ancestry, Plaintiff has suffered and will continue to suffer damages.

197.    Defendant CCA engaged in these discriminatory practices with malice or with reckless indifference to Plaintiff's state-protected rights.

198.    Plaintiff has sought and obtained a right to sue letter from the California Civil Rights Department, thereby exhausting her administrative remedies under this § 12920.

**Count V**
**Breach of Contract**

199.    Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

200.    Defendant CCA's Policy on Discrimination and Unlawful Harassment states:

If an employee believes that he or she has been subjected to any form of unlawful discrimination, he or she should submit a written complaint to the director of human resources, the president of the college, and/or his or her supervisor. The complaint should 63 [sic] be specific and include the names of the individuals involved as well as the names of any witnesses. CCA will, in all appropriate cases, immediately undertake an effective, thorough, and objective investigation.

CCA will endeavor to protect the privacy and confidentiality of all parties involved, as much as is possible. If the college determines that unlawful discrimination has occurred, effective remedial action will be taken, commensurate with the severity of the offense, up to and including termination. Appropriate action will also be taken to deter any future discrimination. Whatever action is taken will be made known to the complaining employee. The college will not retaliate against an employee for filing any good-faith complaint and will not knowingly permit retaliation by management, coworkers, or other employees.

201.    Defendant CCA's Policy on Discrimination and Unlawful Harassment further states:

Unlawful Harassment

In accordance with applicable law, CCA prohibits sexual harassment and harassment based on race, color, national origin, ancestry, religion, creed, disability, gender, gender identity, medical condition, marital status, sexual orientation, age, or any other basis protected by federal, state, or local law. The college is committed to taking all reasonable steps to prevent harassment.

202.    Defendant CCA's Policy on Discrimination and Unlawful Harassment sets out the following procedures:

Reporting Procedure
CCA's reporting procedure provides for an immediate, thorough, and objective investigation of any harassment claim; appropriate disciplinary action against anyone found to have engaged in prohibited harassment; and appropriate remedies to any victim of harassment.

1.    Employees who believe they have been harassed on the job should as soon as possible submit a verbal or (preferably) written complaint to the director of human resources, the president of the college, and/or their supervisor. The report should include details of the incident(s), the names of individuals involved, and the names of any witnesses. Supervisors and managers should immediately refer all harassment reports to the director of human resources or the president of the college.
2.    The college will immediately undertake an effective, thorough, and objective

investigation of the harassment allegations. The determination regarding the alleged harassment will be communicated to the employee(s) who complained and the accused harasser(s).

3. If CCA determines that harassment has occurred, the college will take effective remedial action commensurate with the circumstances, including appropriate disciplinary action (up to and including termination) against anyone found to have engaged in prohibited harassment, and appropriate remedies to any victim of harassment. Appropriate action will also be taken to deter any future harassment.

Whatever action is taken against the harasser(s) will be communicated to the employee(s) who complained, to the extent that the college believes it is appropriate to do so.

203.    The provisions of CCA's Policy on Discrimination and Unlawful Harassment are elements of the contract between CCA and Plaintiff.

204.    Defendant CCA breached its contract with Plaintiff by failing to conduct an effective, thorough, or objective investigation of the complaints against her. In particular, CCA failed to properly consider and weigh the testimony of the one witness Plaintiff had identified in connection with the SJP complaint against her.

205.    As a proximate result of the aforesaid breaches, plaintiff suffered damages, including the loss of her ability to function effectively as a professional academic, and damage to her reputation, in amounts to be assessed at trial.

206.    All conditions precedent for a breach of contract claim have been met.

207.    In addition to the monetary damages defined in ¶199, Plaintiff seeks injunctive relief to remedy certain of Defendant's wrongful acts for which no legal remedy is adequate. These include but are not limited to the issuance of an Order directing Defendant to remove from Plaintiff's employment file any notation made on the basis of Plaintiff's interaction with a student described in ¶¶78-116 above, to the effect that Plaintiff is liable to punishment, up to and including termination, if Plaintiff again engages in the conduct for which she was found to have harassed a student as alleged in ¶¶78-116.

208. To the extent that it is required as a matter of California law, mutuality of remedies exists in that both Plaintiff and Defendant would be entitled to equitable relief mandating compliance with the parties' contract, including the provisions of that contract barring discriminatory conduct and harassment.

209. The relief sought here is definite, consisting of:

    A. an Order mandating removal from Plaintiff's personnel file of the record in that file relating to CCA's discriminatory determination that Plaintiff had harassed a student, and

    B. an Order mandating that CCA cease to maintain a hostile work environment as defined in this Second Amended Complaint.

210. The performance defined by the injunctive relief sought in this Count is substantially similar to the conduct promised by CCA in its agreement with Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Fiss respectfully prays that this Court order the following relief:

1. An injunction preliminarily and permanently enjoining Defendant from continuing to discriminate against Jews, including Plaintiff and others, who share a commitment to the existence of Israel as a Jewish State;

2. A writ of mandate permanently requiring Defendant to enforce all of its policies, including its Policy on Nondiscrimination and its all-comers policy on an even-handed basis, equally for Jews who support the existence of Israel as a Jewish State and for all other persons, ensuring that Jewish members of the CCA community are protected, with respect to their physical safety and otherwise, from discrimination on the basis of their Jewish identity, including those for whom Zionism is an integral part of that identity.

3.  An injunction preliminarily and permanently mandating that Defendant take action to end the hostile environment for Jews on campus by (i) communicating to the entire CCA community via broadcast e-mail or a similar medium that CCA will condemn, investigate, and punish any conduct that harasses members of the Jewish community, or others, on the basis of their ethnic or ancestral background or their commitment to the existence of Israel as a Jewish State; (ii) providing education about anti-Semitism, including by conducting mandatory training for administrators and professors, in a manner that comprehends the full spectrum of antisemitic conduct, including denial of the right of the Jewish people to self-determination and the centrality of Israel to Judaism; (iii) instituting strict review and approval policies to ensure that the administration does not conduct, or finance, programs that deny equal protection to Jewish members of the CCA community including those for whom Zionism is an integral part of their identity.

4.  A declaratory judgment that Defendant knowingly and intentionally failed to enforce its policies to protect Jewish members of the CCA community has violated Plaintiff's rights under (i) the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, (ii) the Free Exercise Clause of the U.S. Constitution, (iii) Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d et seq., and (iv) Plaintiffs' right to contract as ensured by 42 U.S.C. § 1981, and therefore that CCA is ineligible to receive tuition payments with federally subsidized student loans or with benefits paid by the Veterans Administration;

5.  Compensatory and punitive damages;

6.  Plaintiff's reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

7.  Any other relief which this Court may deem just and proper.

Dated: February 4, 2025          Respectfully submitted,

By: /s/ Mark L. Javitch

Mark L. Javitch (CA 323729)
Javitch Law Office
3 East 3rd Ave. Ste. 200
San Mateo, CA 94401
Tel: (650) 781-8000
Fax: (650) 648-0705
mark@javitchlawoffice.com

Lori Lowenthal Marcus* (PA 53388)
Jerome Marcus* (PA 50708)
The Deborah Project
P.O.B. 212
Merion Station, PA 19066
Tel: (610) 880-0100
lorilowenthalmarcus@deborahproject.org
jmarcus@deborahproject.org

*Admitted Pro Hac Vice

*Attorneys for Plaintiff*